[L.A. No. 27167. In Bank. Mar. 15, 1965.]

LEONA ADDISON, Plaintiff and Appellant, v. MORTON CUTLER ADDISON, Defendant and Appellant.

Mosk & Rudman, Norman G. Rudman and M. B. Frieden for Plaintiff and Appellant.

Brock & Shapero, Robert L. Brock and Edwin S. Saul for Defendant and Appellant.

PETERS, J.—Plaintiff Leona Addison (hereafter referred to as Leona) was granted an interlocutory decree of divorce from defendant Morton Addison (hereafter referred to as Morton) on the ground of his adultery. As part of that judgment the trial court held, *inter alia*, that the only community property was the household furniture and furnishings,[1] and that Morton was to pay the current income tax

---

[1]The judgment included the following provisions:

"10. All of the community property consisting of furniture and furnishings is awarded to plaintiff as her sole and separate property."

"12. That other than the furniture and furnishings awarded to plaintiff there is no community property and that all property standing in the name of the defendant MORTON CUTLER ADDISON is the sole and separate property of said defendant."

liabilities for both Leona and himself, holding his wife harmless from such claims.[2] Both parties have appealed, Leona on the question of the extent of the community property, and Morton on his obligation to pay, without recoupment, the current income tax obligations.

At the time of their marriage in Illinois in 1939, Morton, having previously engaged in the used car business, had a net worth which he estimated as being between $15,000 and $20,000. Leona, however, testified that her husband's net worth was almost nothing at the time of their marriage. In 1949 the Addisons moved to California bringing with them cash and other personal property valued at $143,000 which had been accumulated as a result of Morton's various Illinois business enterprises. Since that time Morton has participated in several California businesses.

On February 20, 1961, Leona filed for divorce and requested an equitable division of the marital property. On trial, Leona asserted two theories in support of her claim of property rights. The first was based upon statements Morton allegedly made to her indicating that she had a proprietary interest in property standing in his name alone, i.e., the theory of oral transmutation. In addition, Leona attempted to apply the recently enacted quasi-community property legislation[3] by contending that the property presently held in

---

[2] "8. Defendant is ordered to pay all current income tax liabilities to the United States Government . . . and the current tax liability to the Government of the State of California . . . and is ordered to hold plaintiff harmless from such obligations." (*Id.*)

[3] The key sections of the 1961 legislation which are involved in the instant case are as follows:

Civil Code section 140.5: "As used in Sections 140.7, 141, 142, 143, 146, 148, 149 and 176 of this code, 'quasi-community property' means all personal property wherever situated and all real property situated in this State heretofore or hereafter acquired:

"(a) By either spouse while domiciled elsewhere which would have been community property of the husband and wife had the spouse acquiring the property been domiciled in this State at the time of its acquisition; or

"(b) In exchange for real or personal property, wherever situated, acquired other than by gift, devise, bequest or descent by either spouse during the marriage while domiciled elsewhere.

"For the purposes of this section, personal property does not include and real property does include leasehold interests in real property."

Civil Code section 146 provides in part: "In case of the dissolution of the marriage by decree of a court of competent jurisdiction or in the case of judgment or decree for separate maintenance of the husband or the wife without dissolution of the marriage, the court shall make an order for disposition of the community property and the quasi-community property and for the assignment of the homestead as follows:

"(a) If the decree is rendered on the ground of adultery, incurable

Morton's name was acquired by the use of property brought from Illinois and that that property would have been community property had it been originally acquired while the parties were domiciled in California.

The trial court found no oral transmutation of Morton's separate property into community property, a finding amply supported by the record, and held the quasi-community property legislation to be unconstitutional.[4]

The trial court, as noted above, did find the household furniture and furnishings to be community property and, pursuant to Civil Code section 146, awarded them to Leona. In addition, the court found that the residence of the parties was held in joint tenancy and thus each owned an undivided one-half separate interest therein. Finally, all other property which had been in Morton's name alone was found to be his sole and separate property.

The sociological problem to which the quasi-community property legislation addresses itself has been an area of considerable legislative and judicial activity in this state. One commentator has expressed this thought as follows: "Among the perennial problems in the field of community property in California, the status of marital personal property acquired while domiciled in another State has been particularly troublesome. Attempts of the Legislature to designate such personalty as community property uniformly have been thwarted by court decisions." (Comment (1935) 8 So.Cal. L.Rev. 221, 222.)

The problem arises as a result of California's attempts to apply community property concepts to the foreign, and

---

insanity or extreme cruelty, the community property and quasi-community property shall be assigned to the respective parties in such proportions as the court, from all the facts of the case, and the condition of the parties, may deem just.

"(b) If the decree be rendered on any other ground than that of adultery, incurable insanity or extreme cruelty, the community property and quasi-community property shall be equally divided between the parties."

[4]The court announced: "[T]he Court feels that for that section [Civ. Code, § 140.5] to be applied as against the property in this case, which was brought from Illinois after years of marriage there and then years of living in residence in California, would be unconstitutional."

The trial court's declaration of its belief that the quasi-community property legislation is unconstitutional may be utilized to interpret its finding of fact as to the extent of community property held by the parties. (*Union Sugar Co.* v. *Hollister Estate Co.*, 3 Cal.2d 740, 750 [47 P.2d 273]; *Estate of McAfee*, 182 Cal.App.2d 553, 555 [6 Cal.Rptr. 79]; *Dahlin* v. *Moon*, 141 Cal.App.2d 1, 4 [296 P.2d 344]; *People* v. *One 1951 Ford Sedan*, 122 Cal.App.2d 680, 683 [265 P.2d 176].)

radically different (in hypotheses) common-law theory of matrimonial rights. In fitting the common-law system into our community property scheme the process is of two steps. First, property acquired by a spouse while domiciled in a common-law state is characterized as separate property. (*Estate of O'Connor*, 218 Cal. 518 [23 P.2d 1031, 88 A.L.R. 856].) Second, the rule of tracing is invoked so that all property later acquired in exchange for the common-law separate property is likewise deemed separate property.[5] (*Kraemer* v. *Kraemer*, 52 Cal. 302.) Thus, the original property, and all property subsequently acquired through use of the original property is classified as the separate property of the acquiring spouse.

One attempt to solve the problem was the 1917 amendment to Civil Code section 164 which had the effect of classifying all personal property wherever situated and all real property located in California into California community property if that property would not have been the separate property of one of the spouses had that property been acquired while the parties were domiciled in California.[6] Insofar as the amendment attempted to affect personal property brought to California which was the separate property of one of the spouses while domiciled outside this state, *Estate of Thornton*, 1 Cal.2d 1 [33 P.2d 1, 92 A.L.R. 1343], held the section was unconstitutional. The amendment's effect upon real property located in California was never tested but generally was considered to be a dead letter as the section was never again invoked on the appellate level.[7]

[5]It has been suggested that California might be constitutionally able to abrogate the tracing rule and thus classify property acquired in California without inquiring as to the source of the funds used for the property's acquisition. See Leflar, *Community Property and Conflict of Laws* (1933) 21 Cal.L.Rev. 221, 229. This, however, does not appear to be the purpose and intent of the quasi-community property legislation.

[6]Sections 162 and 163 of the Civil Code defined separate property then, as they do now, essentially as that property acquired by each spouse before marriage in any manner and during the marriage by gift, bequest, devise or descent. Section 164, before being amended in 1961, included the following: "All other property acquired after marriage by either husband or wife, or both, including real property situated in this State and personal property wherever situated, heretofore or hereafter acquired while domiciled elsewhere, which would not have been the separate property of either if acquired while domiciled in this State, is community property; . . ."

[7]One of the results of the 1961 legislation, which established quasi-community property, was the repeal of the 1917 and 1923 amendments of Civil Code section 164, the substance of which is quoted in footnote 6, *supra*.

· Another major attempt to alter the rights in property acquired prior to California domicile was the passage of Probate Code section 201.5.[8] This section gave to the surviving spouse one half of all the personal property wherever situated and the real property located in California which would not have been the separate property of the acquiring spouse had it been acquired while domiciled in California. As a succession statute, its constitutionality was upheld on the theory that the state of domicile of the decedent at the time of his death has full power to control rights of succession. (*In re Miller,* 31 Cal.2d 191, 196 [187 P.2d 722].) In other words, no one has a vested right to succeed to another's property rights, and no one has a vested right in the distribution of his estate upon his death. Hence succession rights may be constitutionally altered. This theory was a basis of the dissent in *Thornton.*

In the present case, it is contended that *Estate of Thornton, supra,* 1 Cal.2d 1, is controlling and that the current legislation, by authority of *Thornton,* must be held to be unconstitutional. *Thornton* involved a situation of a husband and wife moving to California and bringing with them property acquired during their former domicile in Montana. Upon the husband's death, his widow sought to establish her community property rights in his estate as provided by the then recent amendment to Civil Code section 164.[9] The majority held the section unconstitutional on the theory that upon acquisition of the property the husband obtained vested rights which could not be altered without violation of his privileges and immunities as a citizen and also that "to take the property of A and transfer it to B because of his citizenship and domicile, is also to take his property without due process of law. This is true regardless of the place of acquisition or the state of his residence." *Estate of Thornton, supra,* 1 Cal.2d 1, 5.)

The underlying rationale of the majority was the same in

---

[8]As passed in 1935, Probate Code section 201.5 provided: "Upon the death of either husband or wife one-half of all personal property, wherever situated, heretofore or hereafter acquired after marriage by either husband or wife, or both, while domiciled elsewhere, which would not have been the separate property of either if acquired while domiciled in this State, shall belong to the surviving spouse; the other one-half is subject to the testamentary disposition of the decedent, and in the absence thereof goes to the surviving spouse, subject to the debts of the decedent and to administration and disposal under the provisions of Division III of this code." (Stats. 1935, ch. 831, p. 2248, § 1.)

[9]See footnote 6, *supra.*

*Thornton* as it had been since *Spreckels* v. *Spreckels,* 116 Cal. 339 [48 P. 228, 58 Am.St.Rep. 170, 36 L.R.A. 497], which established, by a concession of counsel, that changes in the community property system which affected ''vested interests'' could not constitutionally be applied retroactively but must be limited to prospective application.

Langdon, J., in his dissent in *Thornton,* conceded the correctness of the vested right theory but argued that the statute was merely definitional, giving no rights to anyone except as provided by other legislation. Therefore, the widow would only be acquiring rights pursuant to a right of succession as granted by statute. As to the constitutionality of this application of amended Civil Code section 164 he declared: ''It is a rule of almost universal acceptance that the rights of testamentary disposition and of succession are wholly subject to statutory control, and may be enlarged, limited or abolished without infringing upon the constitutional guaranty of due process of law.'' (*Estate of Thornton, supra,* 1 Cal.2d 1, 7.) The majority refused to construe amended Civil Code section 164 in this limited fashion.

The constitutional doctrine announced in *Estate of Thornton, supra,* has been questioned. Justice (now Chief Justice) Traynor in his concurring opinion in *Boyd* v. *Oser,* 23 Cal. 2d 613 [145 P.2d 312], had the following to say (at p. 623): ''The decisions that existing statutes changing the rights of husbands and wives in community property can have no retroactive application have become a rule of property in this state and should not now be overruled. It is my opinion, however, that the constitutional theory on which they are based is unsound. [Citations.] That theory has not become a rule of property and should not invalidate future legislation in this field intended by the Legislature to operate retroactively.''

The underlying theory of *Thornton* has also been questioned by several legal authorities in this field. (Armstrong, *"Prospective" Application of Changes in Community Property Control—Rule of Property or Constitutional Necessity?* (1945) 33 Cal.L.Rev. 476; Schreter, *"Quasi-Community Property" in the Conflict of Laws* (1962) 50 Cal.L.Rev. 206; Comment, *Community and Separate Property: Constitutionality of Legislation Decreasing Husband's Power of Control Over Property Already Acquired* (1938) 27 Cal.L.Rev. 49, 51-55; see also Comment (1927) 15 Cal.L.Rev. 399.)

Thus, the correctness of the rule of *Thornton* is open to

challenge. But even if the rule of that case be accepted as sound, it is not here controlling. This is so because former section 164 of the Civil Code has an entirely different impact from the legislation presently before us. ■ The legislation under discussion, unlike old section 164, makes no attempt to alter property rights merely upon crossing the boundary into California. It does not purport to disturb vested rights ''of a citizen of another state, who chances to transfer his domicile to this state, bringing his property with him. . . .'' (*Estate of Thornton, supra,* 1 Cal.2d 1, at p. 5.) Instead, the concept of quasi-community property is applicable only if a divorce or separate maintenance action is filed here after the parties have become domiciled in California. Thus, the concept is applicable only if, after acquisition of domicile in this state, certain acts or events occur which give rise to an action for divorce or separate maintenance. These acts or events are not necessarily connected with a change of domicile at all.

■ It cannot be successfully argued that the quasi-community property legislation is unconstitutional because of a violation of the due process clause of the federal Constitution.[10] Morton has not been deprived of a vested right without due process. ■ As Professor Armstrong has correctly pointed out in her article, *supra*: ''Vested rights, of course, may be impaired 'with due process of law' under many circumstances. The state's inherent sovereign power includes the so called 'police power' right to interfere with vested property rights whenever reasonably necessary to the protection of the health, safety, morals, and general well being of the people. The annals of constitutional law are replete with decisions approving, as constitutionally proper, the impairing of, and even the complete confiscation of, property rights when compelling public interest justified it.
''. . . . . . . . . . . . . .

''The constitutional question, on principle, therefore, would seem to be, not whether a vested right is impaired by a marital property law change, but whether such a change reasonably could be believed to be sufficiently necessary to the public welfare as to justify the impairment.'' (Armstrong, '' *Prospective*'' *Application of Changes in Community Property Control —Rule of Property or Constitutional Necessity?* (1945) *supra,* 33 Cal.L.Rev. 476, 495-496.)

---

[10]The Fourteenth Amendment to the United States Constitution provides, in part: ''. . . nor shall any State deprive any person of . . . property, without due process of law. . . .''

█ Clearly the interest of the state of the current domicile in the matrimonial property of the parties is substantial upon the dissolution of the marriage relationship. This was expressly recognized by the United States Supreme Court in *Williams* v. *North Carolina*, 317 U.S. 287 [63 S.Ct. 207, 87 L.Ed. 279, 143 A.L.R. 1273], where it was said (at p. 298): "Each state as a sovereign has a rightful and legitimate concern in the marital status of persons domiciled within its borders. The marriage relation creates problems of large social importance. Protection of offspring, property interests, and the enforcement of marital responsibilities are but a few of commanding problems in the field of domestic relations with which the state must deal."

In recognition of much the same interest as that advanced by the quasi-community property legislation, many common-law jurisdictions have provided for the division of the separate property of the respective spouses in a manner which is "just and reasonable" and none of these statutes have been overturned on a constitutional basis.[11]

In the case at bar it was Leona who was granted a divorce from Morton on the ground of the latter's adultery and hence it is the spouse guilty of the marital infidelity from whom the otherwise separate property is sought by the operation of the quasi-community property legislation. █ We are of the opinion that where the innocent party would otherwise be left unprotected the state has a very substantial interest and one sufficient to provide for a fair and equitable distribution of the marital property without running afoul of the due process clause of the Fourteenth Amendment. For the same reasons sections 1 and 13 of article I of the California Constitution, substantially similar in language, are not here applicable.

---

[11]Because of the experience of the common-law jurisdictions it is the position of the California Law Revision Commission, whose recommendations formed the basis of the 1961 legislation, that where, as here, the divorce is granted on the ground of adultery, and it is the property of the adulterous spouse that is being divided as the court deems just, no valid constitutional objection can be raised. (See Marsh, *A Study Relating to Inter Vivos Rights in Property Acquired by Spouse While Domiciled Elsewhere* (1961) 3 Cal. Law Revision Com. Rep., Rec. & Studies I-21, I-26, attached to the commission's report.)

Illinois, the former domicile of the Addisons, has no specific statutory authority granting a spouse a share in the other spouse's separate property upon divorce. However, in 1949 it enacted legislation authorizing a settlement of property in lieu of alimony (Ill. Rev. Stat. ch. 40, § 19 (1959)) and this statute has been frequently utilized in situations analogous to the instant case. (See *Schwarz* v. *Schwarz*, 27 Ill.2d 140 [188 N.E.2d 673]; *Smothers* v. *Smothers*, 25 Ill.2d 86 [182 N.E.2d 758]; *Savich* v. *Savich*, 12 Ill.2d 454 [147 N.E.2d 85].)

Morton also asserts that there is an abridgment of the privileges and immunities clause of the Fourteenth Amendment[12] citing *Estate of Thornton, supra,* 1 Cal.2d 1. ██ As has been observed "The 'privileges and immunities' protected are only those that belong to citizens of the United States as distinguished from citizens of the States—those that arise from the Constitution and laws of the United States as contrasted with those that spring from other sources." (*Hamilton* v. *Regents of the University of California,* 293 U.S. 245, 261 [55 S.Ct. 197, 79 L.Ed. 343], rehg. den. 293 U.S. 633 [55 S.Ct. 345, 79 L.Ed. 717].) Aside from the due process clause, already held not to be applicable, *Thornton* may be read as holding that the legislation there in question impinged upon the right of a citizen of the United States to maintain a domicile in any state of his choosing without the loss of valuable property rights.[13] As to this contention, this distinction we have already noted between former Civil Code section 164 and quasi-community property legislation is relevant. ██ Unlike the legislation in *Thornton,* the quasi-community property legislation does not cause a loss of valuable rights through change of domicile. The concept is applicable only in case of a decree of divorce or separate maintenance.

It is also argued that the legislation here under discussion may be unconstitutional under the privileges and immunities clause of section 2 of article IV of the United States Constitution. It is there provided that "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several states." The argument is that under the doctrine of *Spreckels* v. *Spreckels, supra,* 116 Cal. 339, California has refused to tamper with vested marital property rights of its own citizens and must therefore accord the same treatment to citizens of other states. ██ As the United States Supreme Court has observed, "Like many other constitutional provisions, the privileges and immunities clause is not an absolute. It does bar discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States. But it does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it. Thus the inquiry in each case must be concerned with whether such reasons do exist and whether the degree of dis-

---

[12]"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States. . . ."

[13]Comment (1934) 8 So.Cal.L.Rev. 221, 225.

crimination bears a close relation to them. The inquiry must also, of course, be conducted with due regard for the principle that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures." (*Toomer* v. *Witsell*, 334 U.S. 385, 396 [68 S.Ct. 1157, 92 L.Ed. 1460], rehg. den. 335 U.S. 837 [69 S.Ct. 12, 93 L.Ed. 389].) █ In the case at bar, Leona, as a former nondomiciliary of California, is a member of a class of people who lost the protection afforded them in Illinois had they sought a divorce there before leaving that state. (See Marsh, Marital Property in Conflict of Laws (1st ed. 1952) pp. 233-234 and cases cited in fn. 22.) She has lost that protection, and is thus in need of protection from California. Hence, the discrimination, if there be such, is reasonable and not of the type article IV of the federal Constitution seeks to enjoin.

█ Additionally, it is urged that the quasi-community property legislation is not applicable to Morton because the legislation was enacted subsequent to the filing of the cause of action but prior to the judgment. This position is untenable. (See *Peabody* v. *City of Vallejo*, 2 Cal.2d 351, 363-364 [40 P.2d 486] (the law at the time of judgment is controlling); see also *Tulare Dist.* v. *Lindsay-Strathmore Dist.*, 3 Cal.2d 489, 526-528 [45 P.2d 972].)

█ Nor is the statute being applied retroactively. That is so because the legislation here involved neither creates nor alters rights except upon divorce or separate maintenance. The judgment of divorce was granted after the effective date of the legislation. Hence the statute is being applied prospectively.

█ It follows that the trial court was in error in refusing to apply the quasi-community property legislation to the case at bar.

It has been urged that the trial court's finding of the separate nature of the property was not based solely upon the legal question discussed above, but was predicated, in part, upon the evidence relating to the manner in which that property was acquired. However, the trial court's finding on this issue (other than the general conclusion that the property held by the husband was his separate property) leaves doubt as to the basis of that determination. When first announcing his decision, the trial judge stated that his finding was based upon his assumption of the unconstitutionality of the statute. Subsequent to judgment, and on motion for new trial, he cast some doubt upon his former statement. Under the circumstances,

we believe that the issue of the separate or community nature of the property should be tried under conditions wherein the trial court's determination of fact will not be colored by an erroneous belief as to applicable law.

As to Morton's cross-appeal on the question of the payment of taxes without recoupment from Leona,[14] it has been conceded that if we reverse on Leona's appeal we must do likewise with the cross-appeal because if Leona is to have a share of the assets derived from the business, the trial court, in its discretion, may decide that she should be liable for a portion of the outstanding taxes.

The judgment is affirmed insofar as it decrees divorce and custody of the minor child. In all other respects the judgment is reversed and the cause remanded to the trial court for retrial in accordance with the views herein expressed, Leona to recover costs on both appeals.

Traynor, C. J., Tobriner, J., Peek, J., Burke, J., and Schauer, J.,* concurred.

McCOMB, J.—I dissent. I would affirm the judgment for the reasons expressed by Mr. Justice Ford in the opinion prepared by him for the District Court of Appeal in *Addison* v. *Addison* (Cal.App.) 40 Cal.Rptr. 330.

The petition of defendant and appellant for a rehearing was denied April 14, 1965, and the opinion and judgment were modified to read as printed above. Mosk, J., did not participate therein. McComb, J., was of the opinion that the petition should be granted.

---

[14]See footnote 2, *supra.*

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.