IRENE ROTHMAN, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT, v. GEORGE IRVING ROTHMAN, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.

Reargued January 7, 1974—Decided June 5, 1974.

220

*Mr. Howard Stern* argued the cause for plaintiff-respondent and cross-appellant (*Messrs. Shavick, Stern, Schotz, Steiger and Croland,* attorneys; *Mr. Stern,* of counsel; *Mr. Samuel D. Bornstein* and *Mr. Donald S. Coburn,* on the brief).

*Mr. Alfred C. Clapp* argued the cause for defendant-appellant and cross-respondent (*Messrs. Schneider, Schneider and Behr,* attorneys; *Mr. Clapp,* of counsel).

The opinion of the Court was delivered by

MOUNTAIN, J. The trial court granted plaintiff, Irene Rothman, a divorce on the ground of adultery. The counter-

claim filed by defendant, George Rothman, seeking divorce on the no-fault ground of an 18 month separation with no prospect of reconciliation was dismissed. Thereafter the trial judge took testimony and heard argument on the issues of alimony and equitable distribution of marital assets. His conclusions were set forth in an oral, unreported opinion. Both parties appealed from the ensuing judgment and we granted certification on motion while the case was pending unheard in the Appellate Division. 63 *N. J.* 505 (1973).

On this appeal we are not asked to review the grant of a divorce to plaintiff or the denial of a divorce to defendant. Solely in issue here are the terms of the judgment below that relate to the allocation of marital assets.

The trial judge found that defendant had a minimum net worth of $4,600,000; plaintiff's assets were valued at $400,000. Defendant's net income after taxes was found to be $190,000. The judgment of the court directed defendant to pay plaintiff $45,000 a year by way of alimony and to turn over to her as an equitable share of the marital assets the sum of $700,000. Of this amount, $100,000 was to take the form of a conveyance of defendant's undivided one-half interest in what had been the marital home in Englewood. Prior to divorce the parties had held title to this real estate as tenants by the entirety and it was determined that the property had a value of $200,000.[1] Defendant was given one year within which to tender to the plaintiff assets worth $600,000. The delay was occasioned by the unliquid nature of most of defendant's holdings. Plaintiff was given a security lien upon all of his real estate pending satsifaction of the obligation.

Two issues are presented for disposition. First it is argued by defendant that the grant of power to effect an equitable distribution of marital assets between husband and wife

---

[1] This $200,000 is included in the figure of $400,000 mentioned above as constituting the value of plaintiff's assets.

should be interpreted as having prospective application only.[2] Correlatively it is urged that if the statute is interpreted retrospectively, as applying to any property interest acquired before that date, it must be stricken as unconstitutional because it would then deprive the defendant of property without due process of law. Plaintiff opposes these contentions, taking the position that the Legislature intended the statute to apply to all eligible property owned by a husband or wife at the time of the initiation of a divorce action, provided the case was tried on or after September 13, 1971. As so construed, plaintiff urges, the enactment suffers from no constitutional infirmity.

Secondly, both parties vigorously object to the conclusions reached by the trial court as to the net worth of each, and as to the allocation of assets between them as determined by the court.

We consider first the meaning of the statute. It seems clear that the construction urged by plaintiff more accurately reflects legislative intent and certainly would, in practice, be preferable to that for which defendant contends. Momentarily ignoring constitutional compulsions, and viewing the issue simply as one of statutory construction, we find ourselves unable to believe that the Legislature intended its grant of power to undertake an equitable distribution of marital assets to apply solely to property acquired on or after the effective date of the act. Were this construction to be adopted, it would, in each case, become necessary to determine the date of acquisition of each asset acquired during marriage, often a difficult if not impossible task. A further question would arise should the particular property interest under consideration, though acquired after the effective date of the act, have been purchased with, or received in exchange for,

---

[2] The power to allocate marital assets between husband and wife, incident to a divorce, derives from *L.* 1971, *c.* 212, which became effective September 13, 1971. It is now to be found in *N. J. S. A.* 2A:34–23.

money or other property owned before that date. Moreover, if defendant's contention were adopted, it has been estimated, apparently without exaggeration, that the full effect of the statute would not be felt for at least a generation.[3]

In support of his position defendant points to a number of cases in this State which stand for the proposition that in construing a statute its terms will not be given retroactive effect "unless they are so clear, strong and imperative that no other meaning can be annexed to them, or unless the intent of the legislature cannot otherwise be satisfied." *Kopczynski v. County of Camden,* 2 *N. J.* 419, 424 (1949). See also, *LaParre v. Y. M. C. A. of the Oranges,* 30 *N. J.* 225, 229 (1959); *In re Glen Rock,* 25 *N. J.* 241, 249 (1957); *Nichols v. Board of Education, Jersey City,* 9 *N. J.* 241, 248 (1952). We continue to believe that these statements express a sound rule of statutory interpretation. But it is no more than a rule of statutory interpretation, and all such rules have a single purpose — to aid the court in its quest for legislative intent. Where, as we find here to be the case, supervening considerations clearly compel a contrary determination, this, like all other rules of statutory construction must give way. We find it impossible to credit the Legislature with the intent urged by defendant. Rather we hold that the statutory provision is intended to apply with respect

---

[3]At one time the courts of the State of California held the view that each amendment of that state's community property statutory law could have only prospective effect, and that this result was constitutionally mandated. Thus it was necessary, in any case involving an issue as to marital rights in any specific property, to determine the law at the time of its acquisition as well as the genesis of the funds used in its purchase, in the event it had been purchased. The intolerable confusion generated by this rule — believed at the time to be constitutionally compelled — is vividly portrayed in Professor Barbara N. Armstrong's article, " 'Prospective' Application of Changes in Community Property Control — Rule of Property or Constitutional Necessity," 33 *Cal. L. Rev.* 476 (1945). Apparently the rule has now been changed. *Addison v. Addison,* 62 *Cal.* 2d 558, 43 *Cal. Rptr.* 97, 399 *P.* 2d 897 (1965).

to all property acquired during the marriage, whether before or after the effective date of enactment.

As so interpreted, is the legislation unconstitutional? Admittedly the effect of the statute, as so construed, is to make eligible for distribution, property which, prior to the act, could not have been subjected to such treatment. Does this amount to a deprivation of property without due process of law in violation of the Fourteenth Amendment of the Federal Constitution and Art. 1, par. 1 of the New Jersey Constitution?[4]

Of course, not all retrospective statutes are unconstitutional. A traditional formulation of the applicable rule states that retroactive legislation is constitutionally offensive only to the extent that it modifies or abrogates "vested rights." But, as has been noted,

the term "vested right" is conclusory — a right is vested when it has been so far perfected that it cannot be taken away by statute. [*Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation*, 73 *Harv. L. Rev.* 692, 696 (1960)]

A state may, in the exercise of the police power, enact a statute to promote the public health, safety, morals or general welfare. Such a statute, because of retroactive application or otherwise, may diminish in value or totally destroy an individual's right, whether in property as such or arising out of contract, provided that the public interest to be promoted sufficiently outweighs in importance the private right which is impaired. *Nebbia v. New York,* 291 *U. S.* 502, 54 *S. Ct.*

---

[4]Defendant invokes no constitutional provision other than the due process clause in support of his argument, and we think this implied concession that no other clause is applicable is well taken. The *ex post facto* clause was early held to apply only to retroactive criminal legislation, *Calder v. Bull*, 3 *U. S.* (3 Dall.) 386, 1 L. Ed. 648 (1798). The marriage relation has been held to be a compact not coming within the prohibition against legislation impairing the obligations of contracts. *Maynard v. Hill*, 125 *U. S.* 190, 8 *S. Ct.* 723, 31 L. Ed. 654 (1888).

505, 78 *L. Ed.* 940 (1934); *Home Building & Loan Assn. v. Blaisdell,* 290 *U. S.* 398, 54 *S. Ct.* 231, 78 *L. Ed.* 413 (1934); *Day-Brite Lighting, Inc. v. Missouri,* 342 *U. S.* 421, 72 *S. Ct.* 405, 96 *L. Ed.* 469 (1952); *West Coast Hotel Co. v. Parrish,* 300 *U. S.* 379, 57 *S. Ct.* 578, 81 *L. Ed.* 703 (1937); *Village of Euclid v. Ambler Realty Co.,* 272 *U. S.* 365, 47 *S. Ct.* 114, 71 *L. Ed.* 303 (1926). In these cases, as in many others as well, the court has, after examining the importance of the public interest served by the statute and comparing it with and balancing it against the quality and value of the right affected by the retroactive legislation, reached the conclusion that the state statute in question represented a valid exercise of the police power, despite the fact that in each case there was some clear incursion upon individual private rights. See *Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, supra,* 73 *Harv. L. Rev.* at 697 *et seq.; Tennis, Retroactive Application of California Community Property Statutes,* 18 *Stan. L. Rev.* 514, 518–519 (1966); *Greenblatt, Judicial Limitations on Retroactive Civil Legislation,* 51 *Northwestern Univ. L. Rev.* 540, 561 (1956).

The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained.

\* \* \* \* \* \* \*

The reports of our decisions abound with cases in which the citizen, individual or corporate, has vainly invoked the Fourteenth Amendment in resistance to necessary and appropriate exertion of the police power. [*Nebbia v. New York, supra,* 291 *U. S.* at 525, 54 *S. Ct.* at 510–511, 78 *L. Ed.* at 950 (1933)]

This Court has repeatedly sought to indicate the expansive thrust of the police power of the State when appropriately

exercised. In *Reingold v. Harper*, 6 *N. J.* 182 (1951) Justice Heher described this power in eloquent and comprehensive terms.

The range of the State's discretion in promoting the security and well-being of the public "accords with the subject of its exercise." *Sterling v. Constantin*, 287 *U. S.* 378, 53 *S. Ct.* 190, 195, 77 *L. Ed.* 375 (1932). Where the end is one to which legislative power may properly be directed, it is enough "if it can be seen that in any degree, or under any reasonably conceivable circumstances, there is an actual relation between the means and the end." *Stephenson v. Binford*, 287 *U. S.* 251, 53 *S. Ct.* 181, 187, 77 *L. Ed.* 288 (1932). The wisdom, expediency or policy of a police regulation does not give rise to a justiciable question if the measure is directed to a matter of public concern within the domain of the police power, and the means are reasonable and appropriate to the end in view. The lawmaking body is the sole judge of what is adequate to meet the particular public requirement; judicial interposition is justifiable only where the action taken is arbitrary. The police power is an attribute of sovereignty to serve all the great public needs; and its exercise does not constitute a denial of due process or the equal protection of the law within the concept of the Fifth and Fourteenth Amendments of the Federal Constitution or the due process clauses of our own Constitution, unless it be palpably unreasonable or unduly discriminatory. It is sufficient if there be a rational connection between the means employed and the end sought. Every reasonable presumption is to be made in favor of the validity of the legislative act. Fairly debatable questions as to need and the propriety of the means employed to meet the exigency are within the legislative province. When the subject is comprehended in the police power of the State, "debatable questions as to reasonableness are not for the courts but for the Legislature, which is entitled to form its own judgment." *Sproles v. Binford*, 286 *U. S.* 374, 52 *S. Ct.* 581, 585, 76 *L. Ed.* 1167 (1932).

Persons and property are subject to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the state; and, when the power is exerted by the lawmaking body, it is not a judicial function to determine which one of two modes was likely to be the most effective for the protection of the public interest in view. That is a legislative inquiry, to be resolved in the light of all the information at hand. Judicial interference in this regard would constitute an invasion of the legislative function. Judicial interposition may be had only where there is no real or substantial relation between the legislative act and a valid public interest under the police power or the measure is, beyond all question a palpable invasion of rights secured by the organic law. The expediency of the statute is for the lawmaking body alone. *Jacobson v. Com. of Massachusetts*, 197 *U. S.* 11, 25 *S. Ct.* 358, 49 *L. Ed.* 643 (1905) ; *Euclid, Ohio v. Ambler Realty Co.*, 272 *U. S.* 365, 47 *S. Ct.* 114, 71 *L. Ed.*

303, 54 *A. L. R.* 1016 (1926) ; *Standard Oil Co. v. City of Marysville,* 279 *U. S.* 582, 49 *S. Ct.* 430, 73 *L. Ed.* 856 (1929). [6 *N. J.* at 193–195]

Many of our later cases attest to the breadth and scope of the police power as exerted in the public interest to regulate or control the exercise of rights as well as individual conduct in general. As examples, see *Burton v. Sills,* 53 *N. J.* 86, 102 (1968) (gun control) ; *N. J. Chapter, Am. Institute of Planners v. N. J. State Bd. of Professional Planners,* 48 *N. J.* 581, 599–602 (1967) (regulation of professional planners) ; *David v. Vesta Co.,* 45 *N. J.* 301, 310–314 (1965) (prohibiting discrimination in housing accommodations) ; *Grand Union Co. v. Sills,* 43 *N. J.* 390 (1964) (liquor control) ; *Hudson County News Co. v. Sills,* 41 *N. J.* 220, 226–230 (1963) (regulation of distributors of published materials). In these cases, as in so many others, private rights were held to have been validly curtailed by legislation deemed to be in the greater public interest.

█ It has long been well settled and now stands unchallenged that marriage is a social relationship subject in all respects to the state's police power. *Loving v. Virginia,* 388 *U. S.* 1, 7, 87 *S. Ct.* 1817, 1821, 18 *L. Ed.* 2d 1010, 1015 (1967) ; *Williams v. North Carolina,* 317 *U. S.* 287, 298, 63 *S. Ct.* 207, 213, 87 *L. Ed.* 279, 285 (1942).

Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the legislature. That body prescribes the age at which parties may contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, its effects upon the property rights of both, present and prospective, and the acts which may constitute grounds for its dissolution. [*Maynard v. Hill, supra,* 125 *U. S.* at 205, 8 *S. Ct.* at 726, 31 *L. Ed.* at 657 (1888)]

█ The statute we are considering authorizes the courts, upon divorce, to divide marital assets equitably between the spouses. The public policy sought to be served is at least twofold. Hitherto future financial support for a divorced

wife has been available only by grant of alimony. Such support has always been inherently precarious. It ceases upon the death of the former husband and will cease or falter upon his experiencing financial misfortune disabling him from continuing his regular payments. This may result in serious misfortune to the wife and in some cases will compel her to become a public charge. An allocation of property to the wife at the time of the divorce is at least some protection against such an eventuality. In the second place the enactment seeks to right what many have felt to be a grave wrong. It gives recognition to the essential supportive role played by the wife in the home, acknowledging that as homemaker, wife and mother she should clearly be entitled to a share of family assets accumulated during the marriage. Thus the division of property upon divorce is responsive to the concept that marriage is a shared enterprise, a joint undertaking, that in many ways it is akin to a partnership. Only if it is clearly understood that far more than economic factors are involved, will the resulting distribution be equitable within the true intent and meaning of the statute. See generally, *Freed and Foster, Economic Effects of Divorce, 7 Family Law Quart.* 275 (1973). The widely pervasive effect this remedial legislation will almost certainly have throughout our society betokens its great significance.[5]

Against this exercise of the police power in the public interest we must measure and compare the individual loss that may be sustained by a spouse whose property is allocated to the other spouse incident to a dissolution of the marriage. In the first place the statute does not by its terms directly affect property rights in any way. No interest in property is taken from one person and transferred to another by the

---

[5]It hardly needs repeating that the wisdom of the legislation is not a judicial concern. Where, as is clearly true here, the means chosen have a real and substantial relation to the achievement of the legislative purpose, it matters not whether the judiciary would have selected the same or other means to attain the desired end.

language of the enactment. Only if a person becomes party to a proceeding for divorce, and so more directly subject to the police power of the state, does the statute even have potential relevance. Finally, as we were careful to point out in *Painter v. Painter*, 65 *N. J.* 196 (1974), no change in property rights will occur except upon the entry of a judgment of allocation, which must by its terms be "equitable." This loss or impairment is indeed slight when balanced against the probable benefit to the public welfare inherent in the legislation.

This exercise of power by the State is somewhat akin to an exercise of the zoning power. As a result of each such exercise some property rights, potentially at least, are diminished and made less expansive than before. In Hohfeldian phrase, the bundle of rights which together constitute ownership, has in each case become a somewhat smaller bundle. But the ownership of property is never absolute, nor could it be in an ordered society.

Defendant relies upon such authorities as *Gerhardt v. Sullivan*, 107 *N. J. Eq.* 374 (Ch. 1930); *McGoldrick v. Grebenstein*, 108 *N. J. Eq.* 335 (Ch. 1931) and *Mueller v. Mueller*, 95 *N. J. Super.* 244 (App. Div. 1967). But these precedents afford defendant little help. In none of these cases was there any suggestion that the legislation under review had constituted what we normally think of as an exercise of the police power. Rather each of the laws considered had been intended only to affect private rights. Thus in *Gerhardt* the court examined a statute which had increased a wife's inchoate dower interest in her husband's real estate from one-third to one-half. It held that the act did not affect, and could not constitutionally be held to affect, a wife's interest in real property acquired by her husband before the date the statute was enacted. The husband was held to have acquired a vested right immune from the effect of such legislation. *McGoldrick* dealt with a statute that purported to alter, in somewhat similar fashion, a husband's inchoate curtesy interest. *Mueller* held that legislation which had the

effect, under certain circumstances, of allowing partition of lands held by a husband and wife as tenants by the entirety, could not be construed to apply to lands held in such tenancy before the date of the act.

In each instance the statutes under review in the foregoing cases had an immediate and considerable impact upon private rights, while serving no discernible public purpose of real import. Thus, by affording the acts only prospective application, the interest of the public was not materially diminished, while private rights were protected. In the instant case, however, as we have indicated, there is a highly significant and important social interest which will be seriously impaired by interpreting the statute as having no more than prospective application.

While, as set forth above, we have preferred to meet the constitutional challenge directly, another approach to the problem should not be overlooked. In *Addison v. Addison,* 62 *Cal.* 2d 558, 43 *Cal. Rptr.* 97, 399 *P.* 2d 897 (1965), the Supreme Court of California considered the constitutionality of a statute of that state which included a provision for the distribution of community and quasi-community property in the event of a divorce. Quasi-community property was defined as assets acquired by either spouse elsewhere than in California which would have been community property had they been acquired in California. The Addison couple became residents of California before the enactment of the statute, having brought with them from their former home in Illinois substantial property that had been earned by the husband while resident there and that stood in his name. It was held that the legislation was constitutional on its face and that it could be constitutionally applied to the property acquired in Illinois that had been brought to California before the act was passed. Thus the property of the husband was eligible for distribution to the wife upon divorce.

The court adopted the view, *inter alia,* that in fact the act was not being given any retrospective application:

Nor is the statute being applied retroactively. That is so because the legislation here involved neither creates nor alters rights except upon divorce or separate maintenance. The judgment of divorce was granted after the effective date of the legislation. Hence the statute is being applied prospectively. [*Addison v. Addison, supra,* 43 Cal. Rptr. at 104, 399 *P.* 2d at 904]

The same may as well be said with respect to the statute we are here considering.

 We hold accordingly that the statute, *N. J. S. A.* 2A: 34–23, as amended by *L.* 1971, *c.* 212, given the interpretation set forth above, does not in any way offend the requirement of due process.

As we have already noted, both parties appealed from the judgment of allocation of property as entered by the trial court. This case must, in any event, be remanded for reconsideration of this judgment in the light of our holdings in *Painter v. Painter,* 65 *N. J.* 196 (1974) and *Chalmers v. Chalmers,* 65 *N. J.* 186 (1974), both decided this day. We have, however, carefully reviewed the record in this case and believe that certain observations may prove helpful upon remand.

 In receiving and considering evidence designed to equip him to make an equitable distribution of marital assets, a trial judge enters upon a three-step proceeding. Assuming that some allocation is to be made, he must first decide what specific property of each spouse is eligible for distribution. Secondly, he must determine its value for purposes of such distribution. Thirdly, he must decide how such allocation can most equitably be made.[6]

---

[6]The suggestion has been offered that in undertaking to effect an equitable distribution of marital assets, the trial court should, to establish a starting point, presumptively assign some proportion, generally mentioned as 50%, of all eligible assets to each spouse. We disapprove of this proposal. No basis for it is to be found in the statute itself, it would import into our law concepts now held chiefly, if not solely, in those states where community property law principles have gained acceptance, and we foresee that it might readily lead to unjust results. Rejecting any simple formula, we rather believe

As to the first two of these steps he must receive, and must insist upon having, the full cooperation of the litigants. Counsel for both husband and wife should, in advance of such a hearing, see that their clients have carefully reviewed all eligible property interests they possess and that they come to court prepared to testify fully and accurately with respect thereto. This will normally involve an expenditure of time, and in some cases an expenditure of money as well. It will be necessary to consult checkbooks and other financial records including tax returns, to inventory the contents of safe deposit boxes and to secure up-to-date appraisals of real estate and of business interests. The assistance of appraisers and accountants will sometimes be required.

We emphasize these considerations because of their rather conspicuous absence at the trial of this case. The defendant is a wealthy man and his business interests widespread and complex. But this affords no excuse for a failure to set forth clearly and in detail a description as well as the value of each interest in property that he owns and that may be eligible for distribution. The same is true of the plaintiff and will be true as to all marital litigants. We confess to an inability, upon the present record, to find adequate credible evidence to support — or to disprove — the conclusions reached by the trial court as to the total value of assets eligible for distribution that are owned by each party.

Those portions of the judgment entered below pertaining to the allocation of marital assets are hereby vacated and set aside and this case is remanded for further proceedings con-

that each case should be examined as an individual and particular entity. The point has been well expressed in an opinion of the Supreme Court of Wisconsin,

The formula for division derives from the facts of the individual case. If it is argued that this approach gives great leeway and also places a heavy responsibility on trial courts in divorce cases, there is no gainsaying that fact. However, both flexibility and responsibility are called for by the endless variety of human situations that come to court in family cases. No two are exactly alike. [*Lacey v. Lacey*, 45 *Wis.* 2d 378, 173 *N. W.* 2d 142, 145 (1970)]

sistent with what has been said above and with the decisions in *Painter v. Painter* and *Chalmers v. Chalmers, supra.* The award of alimony made below may also be reviewed by the trial court, because of its close relationship to the judgment of allocation. All alimony payments as ordered below are to be in the meantime continued.

*For remandment* — Chief Justice HUGHES, and Justices JACOBS, HALL, MOUNTAIN, SULLIVAN, PASHMAN and CLIFFORD—6.

*Opposed*—None.