158 N.J. Super. 338 (1978)
386 A.2d 390
SHMUEL YAAKOV GLOBMAN, PLAINTIFF-RESPONDENT,
v.
SHIRLEY GLOBMAN ET AL., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued February 27, 1978.
Decided March 21, 1978.
*340 Before Judges MICHELS, PRESSLER and BILDER.
Mr. Barry L. Baime argued the cause for appellant Shirley Globman (Mr. George Warren, pro se, guardian ad litem for Shirley Globman).
Mr. David M. Botwinick argued the cause for appellants Israel and Rosalind Lev (Messrs. Stark and Stark, attorneys; Mr. Roger L. Hillman of counsel and on the brief).
Mr. Edward B. Meredith argued the cause for the respondent (Messrs. Meredith, Meredith & Chase, attorneys).
The opinion of the court was delivered by PRESSLER, J.A.D.
Shirley Globman, defendant wife in this matrimonial action, has a history of serious mental illness which has for some time required her intermittent hospitalization. Since she was in fact hospitalized during much of the duration of this litigation, including trial which took place in the summer and early fall of 1975, a guardian ad litem, George Warren, Esq., was appointed to protect *341 her interests. The guardian ad litem appeals from those portions of the trial court's judgment denying Mrs. Globman both alimony and the right to any equitable distribution. He also appeals from the fee awarded him for his services as being grossly inadequate. Those portions of the judgment dissolving the marriage on the ground of an 18-month separation and awarding custody of the two children of the marriage to Shmuel Yaakov Globman, plaintiff husband, were entered without contest and are not before us. There is, however, an additional issue which is before us and that is the question of visitation by the children's maternal grandparents, Israel and Rosalind Lev, who are parties to this action by reason of an oral amendment to the complaint allowed at their request after trial commenced. Their sole interest in the action is their right of visitation and they appeal from that portion of the judgment denying them visitation.
The history of this marriage is permeated by the tragedy of Mrs. Globman's illness and its effect on the other family members, culminating in the hostility between her parents and husband and placing the two young children at the very vortex of this family misfortune. The Globmans were married in 1964. Their older daughter, Chava, was born in 1966 and the younger daughter, Etta, in 1970. They lived together in Philadelphia until early 1971, when Mrs. Globman took up residence in her parents' Trenton home with Etta, then about six months old. Mr. Globman remained in Philadelphia with the elder girl. Because of Mrs. Globman's various voluntary hospitalizations in Trenton Psychiatric Hospital after the separation, Etta was in the actual custody of and being raised by her maternal grandparents, the Levs, with no financial contribution to her support being made by her father. Nor, in fact, did he then or at any time thereafter, contribute materially to Mrs. Globman's support, all of whose necessaries during the periods she resided with her parents and all of whose personal needs during the periods of her hospitalization, including *342 the provision of Kosher food, were furnished by the Levs.[1] In early 1975 Mr. Globman removed Etta from her grandparents and has since that time retained custody of both girls.
We deal first with the financial matters. Mrs. Globman is without assets or income and by reason of her psychiatric condition it is unlikely that she can be anticipated to be self-supporting. Her support is therefore a matter of public charge, with such supplements as her parents are able and willing to furnish. Her father, Israel Lev, is an Orthodox rabbi at the head of his own congregation and employed by the State as a chaplain in several of its institutions, including Trenton Psychiatric Hospital. Mrs. Lev is employed by the Division of Youth and Family Services. Mr. Globman is a Social Studies teacher employed by the Philadelphia public school system at a gross salary of about $16,000 annually. His employment benefits include generous medical and paramedical coverage and a $30,000 term life insurance policy of which the children are beneficiaries. For some years past, but apparently not since he has had custody of Etta, he supplemented his income by teaching at a Jewish parochial school, donating, however, his earnings from that source to charity. His assets, all acquired during the marriage, are modest, consisting largely of an inheritance from his mother which included publicly-traded securities having a value at the time of trial between $7,000 and $8,000; a one-third undivided interest in a modest income-producing property containing a store and four apartments located in a redevelopment area of Philadelphia and hence of somewhat uncertain value, but listed at $25,000 for inheritance purposes; a new car which defendant purchased for $6,000; modest securities holdings apart from the inheritance, and a small cash sum. The total value of these assets was not *343 determined by the trial judge but appears to be between $25,000 and $30,000.
With respect to alimony, the amount being sought for Mrs. Globman, at least while hospitalized, was minimal, the proofs indicating that the cost of providing Kosher food was approximately $15 to $20 a week and that approximately $10 a week more would cover those personal items not supplied by the hospital, such as clothing, cosmetics and canteen-type purchases.[2] As we have noted these expenses have been borne by Mrs. Globman's parents.[3] The trial court refused to award any alimony at all for the reason, as stated in its letter opinion, that "the record does not authorize an award of alimony. It does not identify defendant's needs, other than counsel's conjecture for her personal needs  clothing, cosmetics and other essentials." Our review of the record does not, however, support that conclusion. There was uncontroverted testimony by Mrs. Globman's parents supporting the modest claims of the guardian ad litem.
All of the adults here involved are observant, committed and deeply religious Orthodox Jews. Kosher food is not provided by Trenton Psychiatric Hospital and observance of religious dietary requirements is a matter of serious religious conviction for both Mrs. Globman and her parents. We see no reason why she should do without. Her other personal needs may not have been specifically itemized and cost-estimated but there is certainly sufficient proof in this record *344 of the nature of personal amenities which are not supplied by the hospital but which are being provided for by Mrs. Globman's parents, and of the reasonableness of the guardian ad litem's estimate of a $10 weekly sum to pay for them.
Mr. Globman may be of modest means but he is by no means destitute, and it is clear to us that he is able to afford some contribution to these requirements of his wife which, meager as they are, nevertheless are of signal importance in lending some modicum of tolerability to her institutionalization. At the time the trial commenced Mr. and Mrs. Globman had been separated for 4 1/2 years. We regard it as grossly anomalous that during that time Mr. Globman by his own admission contributed not more than a total of $100 for the support of his wife (and nothing for the support of his daughter Etta while she lived with the Levs) but yet, during that same time period made charitable contributions in an amount exceeding $11,000.
In view of the wife's evident needs and the husband's evident ability to meet them at least in part, we remand to the trial court for the fixing of alimony commensurate with the needs, capacities and obligations of the parties. In view of the inordinate passage of time between the commencement of this trial in June 1975 and the disposition of this appeal, the parties shall be afforded the opportunity to present on the remand any additional proofs bearing on these matters.
We regard the trial court's denial of any equitable distribution as equally insupportable. The totality of the trial judge's findings of fact and conclusions of law on this issue, as set forth in its letter opinion, reads in full as follows:
There is little property involved in this case, and I feel that it is all needed for the support and education of the children. A distribution would involve partition problems as well as a trust for the defendant, who is incapacitated. This process would be cumbersome and non-productive. The request is denied. *345 We are sympathetic to the judge's concern for the future well-being of the children. We note, however, that they are in the care and custody of their father who is the intact and income-producing parent. The needs of the wife are immediate and cannot be otherwise met. We need not recite at length either the philosophical underpinnings of equitable distribution enunciated in Rothman v. Rothman, 65 N.J. 219, 228-229 (1974), or the factors to be taken into account in allocating marital assets as enunciated in Painter v. Painter, 65 N.J. 196 (1974). Suffice it to say that the parties here lived together for six years, during which time Mrs. Globman bore and raised these children and, to the extent her capacities permitted, functioned as the wife and mother of this family. Her incapacitating mental illness should not disqualify her from some share, however modest, of the assets acquired during the marriage or from the security which the allocation of assets to her will provide in the event of the death or incapacity of her husband. To the contrary, her present mental condition is, in our view, a factor militating towards fair division. Nor do we regard it as appropriate to deny equitable distribution because she is incompetent and a trust will have to be devised with respect thereto. It is within the power and it is indeed the obligation of the Chancery Court to respond appropriately to these circumstances. We do not comment here on the question of what under the circumstances would constitute a fair division or on the question of the terms of the trust itself or the identity of the trustee. These are matters which are properly left in the first instance to the discretion of the trial judge.
In addressing ourselves to the question of grandparental visitation we are aware of the acute sensitivities and sensibilities involved and we are aware that ultimately the best interests of the children must control. In our view, N.J.S.A. 9:2-7.1, which creates an independent visitation right in the grandparents of minor children whose parents are deceased, divorced or separated, creates a presumption *346 that the best interests of the child ordinarily are served by maintaining their contact and communication with their grandparents. Our careful scrutiny of this record convinces us that it does not support the total termination of grandparental contact ordered by the trial court.
The trial judge's findings and conclusions on the visitation question read in full as follows:
Although N.J.S. 9:2-7.1 allows visitation by grandparents in a proper case, it is clearly not to be granted if nurturing the relationship between the grandparents and grandchildren is to be had at the expense of the children's well-being and the family unit in which they live, or would otherwise create psychological conflict in the children. (Mimkon v. Ford, 66 N.J. 426 (1975))
In the instant case there is much hostility between the grandparents and the father of the children. (See Transcript of June 23, 1975, pp. 29, 102) There was testimony as to at least one incident at the children's school involving Rabbi Lev and the school principal that caused considerable disruption and disturbed Chava. Additionally, the psychiatrist, Dr. Kaplan, in noting the lack of cooperation between the Levs and plaintiff, and the possibility that the Globman children may be particularly susceptible to stressful situations, did not recommend that the Levs be allowed visitation with their grand-children. (Transcript of October 28, 1975, pp. 24, 36) So long as this situation continues, I do not feel that visitation by the Levs would be consonant with the welfare of the children.
Some amplification of these findings by our reference to the proofs is necessary. To begin with, Dr. Kaplan, referred to in the trial judge's statement, is a child psychiatrist practicing in Philadelphia, who interviewed Mr. Globman alone twice and observed him interacting with the children for approximately one hour. It was essentially his opinion that the two children and their father presented a strong cohesive family unit; that the children were happy, well adjusted and doing well, and that the hostility between the grandparents and the father contraindicated any collaboration between them in the rearing of the children. We accept this uncontroverted testimony. We note, however, Dr. Kaplan's ready concession on cross-examination of the fact that occasional controlled and supervised visitation of *347 the children with the grandparents would not constitute the collaboration which he had in mind.
We are also satisfied that Rabbi Lev has in the past exercised what can at best be regarded as regrettably poor judgment in attempting to establish contact between the children, and particularly the younger, and their institutionalized mother. He, in fact, took the younger child to Trenton Psychiatric Hospital to his chaplain's office where some visits between the child and the mother, deeply upsetting to the child, were arranged. The obvious inappropriateness of these efforts by Rabbi Lev, to say nothing of their traumatic effect on the children, was supported by the psychiatric testimony. We are also persuaded that the incident at the children's school involving Rabbi Lev and the school principal was inappropriate, to say the least. We cannot, however, be insensitive to the frustration and desperation of these grandparents, which obviously has been responsible for these lapses. The family situation is obviously enormously difficult for all of these involved adults to cope with.
In our view, the trial judge erred in not balancing these lapses as against the following considerations: first, it was the grandparents who exclusively raised Etta until she was 4 1/2 years old. Her observed happiness, cheerfulness, well-being and successful adjustment observed only six months after she commenced residence with her father cannot but rest on the underlying and fundamental soundness of her grandparental upbringing and their love, attention and care. We would further point out that during the period when Etta was in their care and Chava lived with her father alone in Philadelphia, it was the grandparents who maintained contact between the sisters by bringing Etta to Philadelphia regularly to visit with her older sister at a baby sitter's because the father would not himself, by his own arrangement, participate in these visits. We also point out that the trial judge prudently and tactfully questioned both girls in camera. They both stated their love for their grandparents and Etta particularly stressed the fact that she *348 missed them. They both said, however, that they did not want to visit their grandparents because their father disapproved. We also recognize that the children, as suggested by the psychiatric evidence, may be especially fragile because of their mother's mental illness and, therefore, require protection from undue and unnecessary stress. We certainly do not quarrel with that thesis. We are, however, persuaded that children cannot and indeed, as a matter of their own development and emotional nurturing, should not be so over-solicitously protected as to attempt to insulate them from all conflict and adversity. These children, as their interviews with the trial judge make clear, are each as aware as children their age can be of the fact of the mother's illness and the stress, conflict and adversity between the father whom they love and the grandparents whom they love. In our view, proper solicitude for the emotional well-being of these children by these hostile factions would have dictated some degree of reasonable cooperation between them. We do not regard this hostility alone, however, as justifying the extinguishment of the grandparental contact, which itself is not simply a matter of biological continuity but which can be independently an emotionally supportive factor for the children in ways quite distinct from the parental relationship. See Mimkon v. Ford, 66 N.J. 426, 437 (1975). Indeed, the fact that the custodial parent does not desire visitation between his children and the parents of his spouse can never by itself be sufficient reason for denying that visitation. The whole point of the statute is obviously to permit such visitation in the face of denial thereof by the custodial parent.
The question, then, before us is whether despite the father's disapproval, the record below supports the complete denial of grandparental visitation. It does not. Certainly the grandparents' over-zealousness in wishing to sustain the maternal contact with the children and their other evidences of occasional lack of insightful judgment may well have militated at the time this case was tried against liberal visitation, *349 but that conclusion does not contradict the probability that restricted visitation could have been reasonably managed under such terms and conditions as would have minimized the risk to the children and would at the same time have served to sustain the love and affection between these children and the grandparents, who are so important a part of their young lives. See Mimkon v. Ford, supra, 66 N.J. at 438.
As we have said, considerable time has passed since the order of the trial court here appealed from. In order that an appropriate order can now be made, we remand for further hearing at which the parties should be prepared to introduce further proofs as to the present situation of both the children and the involved adults. A new probation investigation should also be made with specific recommendations as to appropriate terms of restricted visitation. The trial judge should then consider visitation subject to such terms and conditions as will best serve the interests of the children.
With respect to the guardian ad litem's fee, we note that the fee requested was $1,250. The trial judge did not regard the request as inconsistent with the services rendered. Concluding, however, that it was not "in focus with the financial ability of the father," he allowed a fee of $250. We agree with the judge that the request was not unreasonable but that the husband's financial ability, considering his obligations, dictated a lesser allowance. Nevertheless, in our view, the amount allowed was inadequate under all the circumstances and we modify that portion of the judgment to allow a fee of $750.
The final question before us relates to the admissibility of the full record of Mrs. Globman's hospitalizations introduced by Mr. Globman and objected to by the guardian ad litem on the ground of patient and physician's privilege. See Evid. R. 26A-2 (N.J.S.A. 2A:84A-22.2). See also Evid. R. 26A-1 (N.J.S.A. 45:14B-28) ("Psychologist's Privilege"). The trial judge sustained the objection with *350 respect to the bulk of the records. On appeal Mr. Globman contends that the purpose of the proffer was directed to the issues of Mrs. Globman's right to custody and her mental competence. After the pleadings were filed, however, Mrs. Globman's custody demand was withdrawn and the fact of her incompetency was not in issue. We, therefore, regard the hospital records as not having been relevant since they were in effect largely sought to be introduced to prove conceded and undisputed facts. If on the remand, however, Mr. Globman is able to demonstrate to the trial court any relevance which the records may have in respect of the issues requiring retrial and that those relevant portions of the records are not within any applicable privileges, they may, to that extent be introduced.
The provision of the judgment below awarding a counsel fee to the guardian ad litem is modified in accordance herewith. The provisions of the judgment respecting alimony, equitable distribution and grandparental visitation are reversed and these matters remanded for further proceedings in accordance with this opinion. All other provisions of the judgment are affirmed. We do not retain jurisdiction.
NOTES
[1] Her basic maintenance during her hospitalizations was furnished at public expense pursuant to N.J.S.A. 30:4-49, et seq.
[2] No claim had been made prior to trial in respect of the husband's prospective obligation in respect of any speculative future effort by governmental agencies to recoup all or part of the per diem cost of hospital care, although the issue was attempted to be first introduced at trial on Mrs. Globman's behalf. The trial judge refused to consider it and we are satisfied properly so under the circumstances.
[3] The record in this action indicates that the Levs have commenced a separate action against Mr. Globman seeking reimbursement in the sums expended by them on the theory that it was his primary obligation to have provided support to this extent.