Affirmed and Majority and Dissenting Opinions filed May 4, 2006









Affirmed
and Majority and Dissenting Opinions filed May 4, 2006.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-04-00658-CV

____________

 

BARBARA ROBINSON,
INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF JOHN ROBINSON, DECEASED, Appellant

 

V.

 

CROWN CORK &
SEAL COMPANY, INC., Appellee

 



 

On Appeal from the 55th
District Court

Harris County, Texas

Trial Court Cause No. 2002-50324A

 



 

M A J O R I T Y   O P I N I O N

At its essence, this appeal requires us to
consider the breadth of the Legislature=s power to curtail
individual rights.  John and Barbara
Robinson sued Crown Cork and others after discovering Mr. Robinson had
developed mesothelioma from years of working with products containing
asbestos.  In the trial court, Crown Cork
admitted liability; however, before the court entered judgment, the Legislature
enactedCand made
immediately effectiveCa law that would preclude any recovery by
the Robinsons from Crown Cork.  








The Legislature, concerned about the
financial toll of asbestos suits, limited the liability of corporations that
(1) had purchased companies manufacturing asbestos, but (2) did not continue in
the asbestos business.  By making the
legislation effective immediately, the Legislature affected the Robinsons= suit.  Crown Cork moved for summary judgment,
arguing that the legislation exempted it from paying any damages to the
Robinsons because the damages it had already paid to other plaintiffs exceeded
the monetary cap contained in the legislation. 
The trial court agreed and granted summary judgment in favor of Crown
Cork.

Mrs. Robinson[1]
attacks the summary judgment on three grounds, two of which are constitutional
in nature.  First, Mrs. Robinson claims
that the legislation is unconstitutionally retroactive as applied to her
because it extinguished a vested right. 
Next, she claims that the law is unconstitutional because it is a
special law, designed specifically to aid Crown Cork.  Finally, she claims that Crown Cork failed to
establish as a matter of law each element of its affirmative defense.

As to Mrs. Robinson=s first issue, we
agree that the legislation acted retroactively upon her claims.  But we do not conclude that the legislation
is unconstitutionally retroactive as applied to Mrs. Robinson because it was a Avalid exercise of
the police power by the Legislature to safeguard the public safety and welfare
. . . .@  Barshop v. Medina County Underground Water
Conservation Dist., 925 S.W.2d 618, 633B34 (Tex. 1996).

Regarding Mrs. Robinson=s second
constitutional claimCthat the statute is unconstitutional
because it is a special lawCwe conclude the
statute is not a special law.  Clearly it
was drafted to include Crown Cork within its scope, but it was not written to
exclude companies similarly situated to Crown Cork.  And, because it operates on a subject in
which the public at large is interested, it affects all of the citizens of the
State.   








Finally, we hold that Crown Cork proved the
elements of its affirmative defense as a matter of law.  Consequently, we affirm the trial court=s judgment.  We explain below.

Factual Background

John Robinson joined the United States
Navy in 1956, and served for approximately twenty years as a boiler tender on
several Navy vessels.  Mr. Robinson
maintained boilers, pipes, steam lines, and other machinery and equipment
insulated with asbestos products, including insulation products of Mundet Cork
Corporation.

Crown Cork is a manufacturer and
distributor of packaging products for consumer goods.  In 1963, Crown Cork, then a New York
corporation, was the nation=s largest producer
and seller of metal bottle caps, known in the industry as Acrowns.@  Mundet also produced and sold crowns.  Seeking to acquire the assets of Mundet=s competing bottle
cap division, in November of 1963, Crown Cork purchased the majority of Mundet
stock.  Approximately three months later,
Mundet sold its insulation division.[2]  Crown Cork continued to purchase Mundet stock
until February of 1966, when the remaining assets of Mundet were transferred to
Crown Cork by merger.  In 1989, Crown
Cork merged into a new Pennsylvania corporation of the same name.

Years later, John Robinson was diagnosed
with mesothelioma.  He and his wife,
Barbara, sued Crown Cork, Mundet=s successor, and
others for damages caused by Mr. Robinson=s exposure to
asbestos.  The Robinsons moved for
partial summary judgment to establish Crown Cork=s liability for
the damages allegedly caused by Mundet=s products.  Crown Cork did not contest its liability for
compensatory damages.  The trial court
granted the Robinsons= motion as to compensatory damages, but
not as to punitive damages. 








While the Robinsons= suit was pending,
the Texas Legislature passed House Bill 4; House Bill 4 included a new
affirmative defense limiting the liability of successor corporations for
asbestos-related claims.  See Act
of June 2, 2003, 78th Leg., R.S., ch. 204, 2003 Tex. Gen. Laws 847.  Section 17 of House Bill 4 directly impacted
the Robinsons= suit. 
That section provides that certain successor corporations of asbestos
manufacturers may limit their total asbestos liability to the total gross asset
value of the predecessor company at the time of the merger or
consolidation.  Id. ' 17.01.  The only section of House Bill 4 made immediately
effective upon its passage by two-thirds of each house of the Legislature was
Section 17; it became effective on June 11, 2003.  See Act of June 2, 2003, 78th Leg.,
R.S., ch. 204, ' 23.02(b), 2003 Tex. Gen. Laws 898,
899.  In addition, the only section made
retroactive to all cases pending on its effective date was, again, Section
17.  See Act of June 2, 2003, 78th
Leg., R.S., ch. 204, ' 17.02(2), 2003 Tex. Gen. Laws 895.  Section 17 is codified at Chapter 149 of the
Texas Civil Practice & Remedies Code, entitled ALimitations in
Civil Actions of Liabilities Relating to Certain Mergers or Consolidations.@  See Tex.
Civ. Prac. & Rem. Code Ann. '' 149.001B.006.  Throughout the remainder of the opinion we
will refer to Section 17 as Athe Statute.@








The stated purpose of the Statute is to
limit cumulative Asuccessor asbestos-related liabilities@[3] in Texas.  A successor corporation is liable for
asbestos claims[4]
only up to the total gross assets of the transferor corporation from whom it
received the asbestos-related liabilities; total gross assets are determined as
of the time of the merger or consolidation. 
See id. ' 149.003(a); see also id. '' 149.001(4)
(defining Asuccessor@ as Aa corporation that
assumes or incurs, or has assumed or incurred, successor asbestos-related
liabilities@); 149.001(5) (defining Atransferor@ as Aa corporation from
which successor asbestos-related liabilities are or were assumed or incurred@).[5]  A successor corporation is not responsible
for successor asbestos-related liabilities that exceed this limitation.  Id. ' 149.003(a).  Additionally, the Statute provides that, if a
transferor corporation had assumed or incurred successor asbestos-related
liabilities from a prior merger or consolidation with a transferor, then the
fair market value of the total assets of the first transferor shall be used to
determine the successor corporation=s liability.  Id. ' 149.003(b).  To the fullest extent permissible, Texas law
applies to successor asbestos-related liabilities.  See id. ' 149.006 (AThe courts in this
state shall apply, to the fullest extent permissible under the United States
Constitution, this state=s substantive law, including the
limitation under this chapter, to the issue of successor asbestos‑related
liabilities.@).








As noted previously, after the Statute
became effective, Crown Cork moved for summary judgment.  Crown Cork argued that it had already paid
successor asbestos claims in excess of Mundet=s total gross
assets, and therefore, it had no further liability in any asbestos case.[6]  The trial court granted the motion and
severed the Robinsons= claims against Crown Cork from those
against the other defendants.  This
appeal followed.

Robinson=s Issues

On appeal, Mrs. Robinson raises three
issues, contending the trial court erred in granting Crown Cork=s motion for
summary judgment because (1) the Statute violates the Texas Constitution=s prohibition on
retroactive laws, (2) the Statute violates the Texas Constitution=s prohibition on
special laws, and (3) Crown Cork failed to establish as a matter of law each
element of the Statute.

I.        The
Statute Does Not Violate the Texas Constitution=s Prohibition on
Retroactive Laws.

In her first issue, Mrs. Robinson contends
the Statute violates Article I, section 16 of the Texas
Constitution.  That section provides as
follows:   ANo bill of
attainder, ex post facto law, retroactive law, or any law impairing the
obligation of contracts, shall be made.@  Tex.
Const. art I, ' 16. 
Mrs. Robinson does not contend section 16 bans all retroactive
laws.  Instead, she argues vested rights
cannot be extinguished retroactively; she maintains that an accrued cause of
action is a vested right and thus not retroactively extinguishable.  She asserts that her accrued tort claims were
vested before the Statute became effective and therefore could not be
extinguished by subsequently enacted legislation.  Yet, she argues, the Statute completely
eliminated the accrued tort claims against Crown Cork in contravention of
section 16.[7]









We do not find the law on vested rights to
be as consistent and lucid as Mrs. Robinson claims.  For this reason, as we explain below, we
choose not to employ a vested-rights analysis to assess the Statute=s
constitutionality.  Instead, we conclude
that we may look to the police power of the Legislature to find authority for
the Statute=s enactment and for its validationCin spite of its
retroactivity.  The Legislature may
exercise its police power to balance competing individual and societal
interests and to enact legislation that reasonably responds to the issues and
interests before it.  That power and
responsibility goes to the very essence of the Legislature=s role in our
tripartite democratic system.

A.      The
Case Law on Vested Rights is Inconsistent and Difficult to Use as a Guide.








Courts have struggled for years to settle
upon a reliable method for judging the constitutionality of a retroactive
statute.  Many Texas courts and courts of
other states have used the designation Avested right@ to describe a
right that cannot be abrogated by a retroactive law.  See, e.g., Middleton v. Tex.
Power & Light, 108 Tex. 96, 185 S.W. 556, 560 (1916); Mellinger v.
City of Houston, 68 Tex. 37, 3 S.W. 249, 253 (1887); Phillips v. Curiale,
608 A.2d 895, 901B02 (N.J. 1992); Peterson v. City of
Minneapolis, 173 N.W.2d 353, 356B358 (Minn. 1969); see
also Charles B. Hochman, The Supreme Court and the Constitutionality of
Retroactive Legislation, 73 Harv. L.
Rev. 692, 696 (1960); Ray H. Greenblatt, Judicial Limitations on
Retroactive Civil Legislation, 51 Nw.
U. L. Rev. 540, 561B62 (1956).  But a problem arises when one tries to define
a vested right.  Some Texas cases
arguably have used language implying that an accrued cause of action is a
vested right.  See Mellinger, 3
S.W. at 253 (AWhen . . . a state of facts exists as the
law declares shall entitle a plaintiff relief in a court of justice on a claim
which he makes against another . . ., then it must be said that a right exists,
has become fixed or vested, and is beyond the reach of retroactive legislation
. . . .@); but see Ex
Parte Abell, 613 S.W.2d 255, 261 (Tex. 1981) (A[A] right cannot
be considered a vested right unless it is something more than such a mere expectation
as may be based upon an anticipated continuance of the present general laws; it
must have become a title, legal or equitable to the present or future enjoyment
of a demand or a legal exemption from the demand made by another.@).  Other cases have held that a right is not
vested until a final judgment is entered. 
See Walls v. First State Bank of Miami, 900 S.W.2d 117, 122 (Tex.
App.CAmarillo 1995,
writ denied) (stating that Aonly final,
nonreviewable judgments will be accorded the dignity of vested,
constitutionally guarded rights . . . .@); Houston
Indep. Sch. Dist. v. Houston Chronicle Pub. Co., 798 S.W.2d 580, 589 (Tex.
App.CHouston [1st
Dist.] 1990, writ denied) (stating that Athe triggering
event for the vesting of a right is the resolution of the controversy and the
final determination . . . .@).

Thus, our predicament in answering the
precise question Mrs. Robinson has raisedCwhether her
allegedly vested right was retroactively altered in an unconstitutional wayCis this:  no clear answer exists.  For example, Mrs. Robinson declares that her
tort claims were vested rights because the set of facts underlying her cause of
action had already occurred.  This long
has been a way of describing vested rights. 
See Mellinger, 3 S.W. at 253B54.  But even this designation is subject to
variances in application, as the following quote, written more than
seventy-five years ago, illustrates:

One=s first impulse on
undertaking to discuss retroactive laws and vested rights is to define a vested
right.  But when it appears, as soon happens,
that this is impossible, one decides to fix the attention upon retroactive laws
and leave the matter of definition to follow rather than precede the
discussion, assuming for the purpose that a right is vested when it is immune
to destruction, and that it is not vested when it is liable to destruction, by
retroactive legislation.  The
simplification of the task which this plan seems to involve, turns out to be
something of an illusion, however, when it appears, as also soon happens, that
one=s preconceived
notions of retroactive laws are irreconcilable with the data with which one has
to deal.

Bryant Smith, Retroactive Laws and Vested Rights,
5 Tex. L. Rev. 231, 231 (1927)
(footnote omitted).  Apparently, the job
of ascertaining when a right is vested, and when it is not, has vexed courts
and commentators for years.

B.      Some
Courts Have Looked to Alternative Methods to Assess When a Statute is
Unconstitutionally Retroactive.

Courts in other states also have
recognized the dilemma they confront when an allegedly vested right is pitted
against a retroactive law:  

A[D]iscerning
commentators and judges@ have questioned the value of
vested-rights analysis and have suggested that Athe true test of
the constitutionality of a retrospective law is whether a party has changed his
[or her] position in reliance upon the existing law, or whether the
retrospective act gives effect to or defeats the reasonable expectations of the
parties.@  Charles B. Hochman, The Supreme Court and
the Constitutionality of Retroactive Legislation, 73 Harv. L. Rev. 692, 696 (1960) (Hochman)
(footnotes omitted).  Although agreeing
that the parties= reasonable expectations may be relevant,
Hochman has argued that the constitutionality of a retroactive statute is in
fact determined by courts through a weighing of the following factors: (1) the
nature and strength of the public interest served by the statute, (2) the
extent to which the statute modifies or abrogates the asserted right, and (3)
the nature of the right that the statute alters.  Id. at 697.  In Rothman v. Rothman, 65 N.J. 219,
320 A.2d 496 (1974), we applied a similar test to determine whether a
retroactively‑applied statute constituted a deprivation of due
process.  We said in Rothman that
that analysis essentially involves asking whether, after examining the
importance of the public interest served by the statute and comparing it with
and balancing it against the quality and value of the right affected by the
retroactive legislation, [one could conclude] that the statute in question
represented a valid exercise of police power, despite the * * * clear incursion
upon individual private rights. [Id. at 226, 320 A.2d 496.]  See also Berkley Condominium Ass=n v. Berkley
Condominium Residences, Inc., 185 N.J. Super. 313, 320, 448 A.2d 510
(Ch. Div.1982) (when determining what rights may become vested, Aone must examine
what it is that is being taken away and weigh that loss against the social gain
being achieved@).

Phillips, 608 A.2d at 902; see also Nobrega
v. Edison Glen Assoc., 772 A.2d 368, 379B83 (N.J. 2001)
(noting that New Jersey courts have had difficulty clearly defining Avested right@ and choosing to
use a Arational basis@ inquiry rather
than a Avested rights@ inquiry).








The Texas Supreme Court also has
acknowledged the quandary.  See Texas
Water Rights Comm=n v. Wright, 464 S.W.2d 642,
648B49 (Tex.
1971).  Justice Pope, speaking for the
Court, acknowledged the confusion in the case law, noting that A[a] number of
scholars have endeavored to discover the underlying rationale for the cases
which either uphold or strike down a statute which is attacked as
unconstitutionally retroactive.@  Id. at 649.  Justice Pope then briefly discussed several
alternative methods commentators have relied on to determine if a law was
unconstitutionally retroactive.[8]
 Id. 

In light of the inconsistency surrounding
vested rights and the apparent difficulty in determining if a right is vested,
we will follow Justice Pope=s lead and use a
gauge other than vested rights to measure the Statute=s
constitutionality.  

C.      The
Legislature=s Police Power to Enact Retroactive Laws.








Facing claims that a statute
unconstitutionally abrogated allegedly vested rights, a number of older Texas
court of appeals opinions have resolved the issue by considering the
Legislature=s police power.  See, e.g., Texas State Teachers Ass=n v. State, 711 S.W.2d 421,
424 (Tex. App.CAustin 1986, writ ref=d n.r.e.); Ismail
v. Ismail, 702 S.W.2d 216, 222 (Tex. App.CHouston [1st
Dist.] 1985, writ ref=d n.r.e.); State Bd. of Registration
for Prof=l Eng=rs v. Wichita Eng=g Co., 504 S.W.2d 606,
608 (Tex. Civ. App.CFort Worth 1973, writ ref=d n.r.e.); City
of Breckenridge v. Cozart, 478 S.W.2d 162, 165 (Tex. Civ. App.CEastland 1972,
writ ref=d n.r.e.); City
of Coleman v. Rhone, 222 S.W.2d 646, 648 (Tex. Civ. App.CEastland 1949,
writ ref=d.).  The Texas Supreme Court also has done this,
most recently relying on the police power to validate a retroactive statute in Barshop
v. Medina County Underground Water Conservation District, 925 S.W.2d 618,
633B34 (Tex. 1996).  Barshop gives scant guidance on how to
measure the legitimacy of an act of police power against a private right.  Fortunately, a number of the courts of
appeals considering the issue have written rather extensively on the balancing
of rights they have performed when comparing a statute with the private right
that is being altered.  After looking
generally at the scope of the police power, we will then follow the lead of
these courts by considering the reasons the legislature enacted the Statute,
including precautions taken to narrow the scope of the Statute=s reach.  Then, we will measure those legislative
justifications against the private rights the Statute impacts. 

1.       The
Legislature=s Police Power.

Although Mrs. Robinson strenuously argues
that we cannot rely on the police power to validate the Statute, we
disagree.  In fact, we are of the opinion
that the enactment of the Statute was a reasonable exercise of the Legislature=s police power.  

Many courts have spoken to the breadth of
the police power.  Though not unfettered,
it is Abroad and
comprehensive.@  Rhone,
222 S.W.2d at 648.  AIt is founded upon
public necessity which alone can justify its exercise@ and Ahinges upon the
public need for safety, health, security, and protection of the general welfare
of the community.@  Id.
 








When a statute is attacked as violating
the retroactivity clause, the language of the clause must be balanced against
the state=s interest in exercising its police
power.  See Texas State Teachers Ass=n v. State, 711 S.W.2d at
425.  AAlthough the
language of the [retroactivity] clause is facially absolute, its prohibition
must be accommodated to the inherent police power of the state >to safeguard the
interests of its people.=@  Id. at 424 (quoting Energy Reserves
v. Kan. Power & Light, 459 U.S. 400, 103 S. Ct. 697, 74 L. Ed. 2d 569
(1983)).  For this reason, we must
balance the two, and, for this reason, Athe nature of the
power being exercised by the state is important in determining whether any
resulting impairment is permissible.@  Id. at 425; see also Lebohm
v. City of Galveston, 154 Tex. 192, 275 S.W.2d 951, 955 (1955)
(stating that the Legislature may withdraw a common-law remedy for a
well-established common-law cause of action when it is a reasonable exercise of
police power in the interest of the general welfare); Cozart, 478 S.W.2d
at 165 (APolice power is
not static and unchanging.  As the
affairs of the people and government change and progress, so the police power
changes and progresses to meet the needs.@).  

2.       The
Statute=s Purpose.

Certainly the fiscal health of this State
and its inhabitants contributes to the welfare of the citizenry and is an
important concern of the public at large. 
The fiscal health of the State and its inhabitants were the main goals
of this legislation.  We quote
extensively from the Statement of Legislative Intent accompanying the Statute
to illustrate the reasonableness of the Statute=s purpose and the
Legislature=s attempts to make its impact as narrow as
possible:

CThere was concern that the benefits
of this legislation should be limited in some way to those successor corporations
who were the most innocent about the potential hazards of asbestos;

CThere was further concern that the
benefits should be limited in some way to innocent successors who were also at
the greatest financial peril, especially those threatened with bankruptcy;

CThere was also concern that the
legislature should test this new concept by taking one step at a time and
providing realistic relief to those innocent successor corporations most at
peril financially without limiting every type of asbestos liability.

In order to meet these concerns,
the limitations on total liability were themselves narrowed or restricted in
three waysCby two restrictions premised upon
the innocence of the successor and one based upon financial viability.

To focus the benefits upon innocent
successor corporations, two restrictions were added:








CUnder ' 149.002(a), the original transfer
of successor asbestos liabilities has to have occurred prior to May 13,
1968.  Of course, subsequent successors
who receive only that same bundle of original asbestos liabilities through
successive mergers will also be entitled to the liability limits applicable to
that first successor pre‑1968 no matter when the later mergers occur.

It wasn=t until the mid‑1960s that
Dr. Irving Selikoff issued his now famous warnings about the dangers of
asbestos in the workplace.  The earliest
date after Selikoff=s warnings when even a quasi‑governmental
organization in the United States suggested a tighter standard for asbestos in
the workplace was, however, May 13, 1968. 
On that date, the influential American Conference of Governmental
Industrial Hygienists (ACGIH) first adopted a change in the recommended,
longstanding threshold limit for asbestos in the air of a workplace from 5
mppcf to 2 mppcf (the ACGIH 1958 Standard).

A successor corporation would
therefore have been much less likely to be aware of the hazards of asbestos
prior to May 13, 1968.  By requiring that
the first transfer of asbestos liabilities to a successor occurred prior to May
13, 1968, the legislation therefore focuses its benefits upon innocent
successors.

COne class of successors might,
however, have been less innocent than others: 
those in the asbestos business.  Therefore, ' 149.002(b)(5) restricts the benefits of the legislation to
successor corporations that did not continue the predecessor=s asbestos business:  the business of mining asbestos, of selling
or distributing asbestos fibers, or of manufacturing, distributing, installing,
or removing asbestos products.  A
successor that did not merge with a predecessor in order to continue that
predecessor=s asbestos business was less likely
to have known of the hazards of asbestos. 
For example, a successor that was merely trying to acquire a predecessor=s non‑asbestos line of
business would be less knowledgeable about asbestos than a successor who wanted
to continue a predecessor=s asbestos line of business.  A successor that did not continue the
asbestos business of its predecessor also could not have caused any of the
injuries that arose from the discontinued asbestos business.

Together, the preceding
restrictions limit the benefits of the statute to those who were more innocent
than others and were unwittingly saddled with often massive longtail
liabilities only because of a merger.








The third restriction in the
legislation deals primarily with the issue of financial viability.  Corporations actually in the asbestos
business and their successors through merger have been financially drained by
decades of litigation.  As a result,
nearly 70 such corporations have sought protection through bankruptcy.  The cost in jobs and pension benefits, to
cite just two examples, has been substantial. 
This legislation seeks to help keep remaining hard‑pressed
successors out of bankruptcy.  In an
effort to help those most in need first, the legislation focuses upon the most
hard‑pressed of successors, rather than all successors.  Any successor would be liableCeven beyond the total gross asset
value of its predecessorCfor any asbestos‑related
premises liabilities it received from a predecessor for injuries caused on
premises the successor continued to own or control after a merger.  Such successors have not thus far been so
financially burdened by litigation as the successors to those in the asbestos
business itself.  Unlike successors to
those in the asbestos business, much greater insurance resources remain
available to successors facing premises liability claims.  In addition, successor liability for premises
claims are still protected under the legislation in the case of any premises
the successor did not continue to own or control after the merger.  That distinction shows additional concern for
successors who are likely to be more innocent of having caused any injury
themselves.  Such successors may also
still qualify for limits upon other successor asbestos‑related
liabilities that are not based upon premises liability claims.

A last item worth noting is that the liability limits
provided by this legislation do not apply to anyone already in bankruptcy.  It is the purpose of this legislation to help
keep corporations out of bankruptcy, not to assist corporations already in
bankruptcy.  In order to avoid encouraging
any rush to force a corporation into bankruptcy in order to avoid the liability
limits imposed by this legislation, the liability limits will apply if a
corporation is forced into bankruptcy after April 1, 2003.

H.J. of Tex.,
78th Leg., R.S. 6043B45 (2003).

3.       A
Reasonable Exercise of Police Power.

Courts of this State have held that two
considerations determine whether a legislative act is valid under the police
power: (1) whether the act is appropriate and reasonably necessary to
accomplish a purpose within the scope of the police power, and (2) whether the
ordinance is reasonable by not being arbitrary and unjust or whether the effect
on individuals is unduly harsh so that it is out of proportion to the end
sought to be accomplished.  Martin v.
Wholesome Dairy, Inc., 437 S.W.2d 586, 591 (Tex. Civ. App.CAustin 1969, writ
ref=d n.r.e.) (citing Rhone,
222 S.W.2d at 648).  AIf there is room
for a fair difference of opinion as to the necessity and reasonableness of a
legislative enactment . . . on a subject which lies within the police power,
the courts will not hold it void.@  Id. at 592.  Applying these considerations to this case,
we conclude that the Statute is a reasonable exercise of the Legislature=s police
power.  








First, the purpose for which it was
enactedCthe financial
viability of the State and businesses in the StateCis a valid
exercise of police power.  The purpose
recites that nearly seventy companies have filed for bankruptcy, exacting a
heavy toll in both jobs and pension benefits. 
Evidence before the trial court showed that asbestos lawsuits have
negatively impacted Crown Cork=s financial vigor.
 Moreover, by enacting the Statute,
the Legislature impacted over 1,000 lawsuits against Crown Cork in courts
across the State.[9]  In addition, Crown Cork=s summary judgment
evidence shows that Crown Cork=s financial
viability alone is important to citizens in all parts of the State; its
subsidiaries and affiliates have about 1,000 employees across the State, and
roughly the same number of retirees relying on its continued financial
viability for their own and their families= financial
security as they age.  The citizens of
the three municipalities in which Crown Cork=s plants are
located across the stateCSugar Land, Conroe, and AbileneChave an interest
in Crown Cork=s continued financial viability.  Thus, the Statute benefits the entire economy
of the State, an appropriate purpose for which to exercise the police power. 








Second, the Legislature limited the
Statute=s detrimental impact
on plaintiffs such as the Robinsons so that the impact was not out of
proportion to the end sought.  See
Martin, 437 S.W.2d at 591.  The
requirements restrict the number of corporations that qualify for the
limitation of liability, and therefore leave the pool of potential defendants
as large as possible for claimants having valid claims for damages resulting
from asbestos products.  The Statute was
limited in scope to target those corporations most in need of financial relief
and/or assistanceCthose corporations subject to asbestos
suits and payouts because they purchased companies that manufactured
asbestos.  The Statute also restricts its
scope to those companies who are least responsible for the continued manufacture
of asbestos and, therefore, least responsible for the continued negative impact
of asbestos-related health problems on the public.  As a result, Crown Cork was the only
defendant of the number of companies the Robinsons sued that was able to take
advantage of the Statute.

In short, we find the Statute (1) within
the Legislature=s police power and (2) narrowly tailored
(a) to protect the most innocent corporations hard hit by asbestos litigation
but (b) to leave the potential pool of asbestos defendants as large as
possible.  Although Mrs. Robinson claims
that the Statute is unconstitutional, we find that her claims at most show that
room for a fair difference of opinion exists as to the necessity and
reasonableness of the Statute.  By
enacting the Statute, we conclude that the Legislature performed its unique
role within our democratic system by making a judgment call on an issue
uniquely within its purview and within its police power.  Finding a reasonable basis for that decision,
we decline to declare it void.

For these reasons, we conclude that the
Statute was a valid exercise of the State=s police power and
that the Statute was not unconstitutionally retroactive.

4.       Robinson=s Case Law Does
Not Contradict This Conclusion.








Mrs. Robinson argues that we cannot rely
on police power to validate the retroactive effect of the statute on her
accrued rights.  She relies on two cases
to undergird her argument the police power is a facile, potentially
all-encompassing doctrine that we should not rely on to validate this
retroactive statute.  Those cases are City
of Tyler v. Likes, 962 S.W.2d 489 (Tex. 1997), and Baker Hughes, Inc. v.
Keco R. & D., Inc., 12 S.W.3d 1 (Tex. 1999)Cboth Texas Supreme
Court opinions involving retroactive laws that altered allegedly vested
rights.  In evaluating the validity of
the retroactive laws in these cases, the Supreme Court did not consider the
Legislature=s police power.  According to Mrs. Robinson, this is proof
that the police power cannot be used to validate a law that has altered
retroactively a vested right.  We
disagree because we are of the opinion that the court had alternative, and more
straight-forward means of evaluating those laws.

For example, in Likes, the Court
relied on a long-standing method of evaluating the constitutionality of a
statute that retroactively abridged an allegedly vested right.  Likes sued the City of Tyler for negligent
maintenance of a culvert.  Likes,
962 S.W.2d at 502.  At common law,
maintenance of culverts was a proprietary function for which the City of Tyler
could be sued.  However, the Legislature
amended the Texas Tort Claims Act, reclassifying the operation of culverts as a
governmental function for which property damages claims could not be
brought.  Id.  By the time Likes sued the City of Tyler, the
City was immune from suit for the damages. 
Id.  The Court held that
the statute affected a remedy only, noting that Alaws affecting a
remedy are not unconstitutionally retroactive unless the remedy is entirely
taken away.@  Id.  In the enactment of the statute, Athe Legislature
affected the remedy but allowed Likes a reasonable time to preserve her rights.@  Id. 
Because the Legislature provided Likes and others a grace period within
which they could have exercised their remedy before its alteration, the statute
was not unconstitutionally retroactive.  See
id.

Likewise, a simple answer was available to
the court in Keco.  There, the
Legislature extended the statute of limitations for a particular cause of
action brought against Baker Hughes, thus making Baker Hughes potentially
liable on a cause of action that would have been barred by the previous
law.  Keco, 12 S.W.3d at 2.  As in Likes, the court relied on a
firmly established ruleCthat a cause cannot be revived after it is
barred by the statute of limitationsCto hold that the
legislation was unconstitutionally retroactive. 
Id. at 4; see also Wilson v. Work, 122 Tex. 545, 62 S.W.2d
490, 490B91 (1933); Mellinger,
3 S.W. at 254B55.








Thus, unlike this case, in both Keco
and Likes, the Court had rather simple, straightforward answers
available to it.  There was no reason for
the Court to consider the Legislature=s police
power.  For this reason, we do not
interpret the Court=s silence on the Legislature=s police power as
a statement that the police power did not apply, or could not be applied, to
the cases.  

More importantly, the Supreme Court and
other courts of this state have used the Legislature=s police power to
validate retroactive statutes that are allegedly unconstitutional.  See Barshop, 925 S.W.2d at 633B34 (citing cases).  In Barshop, the Court held,
A[a] valid exercise
of the police power by the Legislature to safeguard the public safety and
welfare can prevail over a finding that a law is unconstitutionally
retroactive.@  Barshop,
924 S.W.2d at 633B34.[10]

D.      The
Pennsylvania Supreme Court=s Ieropoli Decision
is Not Persuasive.

Mrs. Robinson also urges us to apply the
reasoning of the Pennsylvania Supreme Court in Ieropoli v. AC&S Corp.,
842 A.2d 919, 932 (Pa. 2004), in which that court held that a similar statute
enacted in Pennsylvania was unconstitutional as applied under the Pennsylvania
Constitution.  The Ieropoli court
found that the statute eliminated all remedy for an accrued cause of action,
and because Aan accrued cause of action is a vested
right,@ it could not be
eliminated by subsequent legislation.  Id.
at 930, 932.  However, in several
significant ways, the Ieropoli decision is quite different from this
appeal.








To begin with, Ieropoli rested on a
different constitutional provision than this appeal.  The plaintiff, Ieropoli, alleged that the
pertinent Pennsylvania statute violated that state=s open courts
provision contained in the state constitution. 
Here, Mrs. Robinson alleges the Statute violates this state=s constitutional
prohibition against retroactive laws, not the open courts provision.  

Next, the Pennsylvania Supreme Court used
a vested rights analysis to strike down that state=s statute,
pointing out Pennsylvania=s unwavering historical stance, as
evidenced in the case law, that an accrued cause of action is a vested right
that cannot be extinguished.  It appears
from Ieropoli that Pennsylvania courts have applied vested rights
analysis in a much more consistent manner than have Texas courts.  As already noted, we have chosen to eschew a
vested rights analysis for what we consider to be a more reliable analysis.

Finally, the most important differences
appear in the statutes themselves.  The
Pennsylvania statute was not as narrowly drawn as the Statute.  The Pennsylvania statute does not appear to
have been crafted to encompass only the most innocent successor corporations.  While the Statute requires that a corporation
must have purchased the asbestos division before May 13, 1968 and must not have
manufactured asbestos itself, the Pennsylvania statute had neither of these
winnowing characteristics.

For all of these reasons, we do not find Ieropoli
persuasive authority.

E.      Summary
of Holding on Robinson=s First Issue.

In summary, we hold that the Statute is
not unconstitutionally retroactive as applied to Mrs. Robinson=s claims because
it is a valid exercise of the Legislature=s police
power.  The Statute, therefore, does not
violate Article I, section 16 of the Texas Constitution.  We overrule Mrs. Robinson=s first issue.

II.       The
Statute is Not an Unconstitutional Special Law.








In her second issue, Mrs. Robinson
contends the Statute is a special law in violation of Texas Constitution
Article III, section 56.  Section 56
provides in part: Awhere a general law can be made
applicable, no local or special law shall be enacted.@  Tex.
Const. art. III, ' 56(b). 
Mrs. Robinson contends that Crown Cork is the only beneficiary of the
Statute, and the Statute singles out Crown Cork for special treatment without a
reasonable public purpose.  Mrs. Robinson=s issue is a
facial challenge, meaning that the Statute, by its terms, always operates
unconstitutionally.  See Garcia,
893 S.W.2d at 518.

A.      The
Applicable Law.

A special law is defined as one A>limited to a
particular class of persons distinguished by some characteristic other than
geography.=@  Ford Motor Co. v. Sheldon, 22 S.W.3d
444,  450 (Tex. 2000) (quoting Tex.
Boll Weevil Eradication Found. v. Lewellen, 952 S.W.2d 454, 465 (Tex.
1977); Maple Run at Austin Mun. Util. Dist. v. Monaghan, 931 S.W.2d 941,
945 (Tex.1996)).  The purpose of the
prohibition on special laws in Article III, section 56 is to A>prevent the
granting of special privileges and to secure uniformity of law throughout the
State as far as possible.=@  Maple Run at Austin Mun. Util. Dist. v.
Monaghan, 931 S.W.2d 941, 945 (Tex. 1996) (quoting Miller v. El
Paso County, 136 Tex. 370, 150 S.W.2d 1000, 1001 (1941)). In particular, it
prevents lawmakers from engaging in the A>reprehensible=@ practice of
trading votes for the advancement of personal rather than public interests.  Id. (quoting Miller, 150 S.W.2d at
1001).  A statute is not special if
persons or things throughout the State are affected by it, or if it operates
upon a subject in which the people at large are interested.  See Sheldon, 22 S.W.3d at 451;
Scurlock Permian Corp. v. Brazos County, 869 S.W.2d 478, 485 (Tex. App.CHouston [1st
Dist.] 1993, writ denied) (citing Lower Colorado River Auth. v. McCraw,
125 Tex. 268, 83 S.W.2d 629, 636 (1935)). 

In passing upon the constitutionality of a
statute, we begin with a presumption of validity.  Robinson v. Hill, 507 S.W.2d 521, 524
(Tex. 1974); Cameron County v. Wilson, 160 Tex. 25, 326 S.W.2d 162, 166
(1959).  We presume that the Legislature
has not acted unreasonably or arbitrarily, and the burden is on Mrs. Robinson,
who challenges the Statute, to establish its unconstitutionality.  Robinson, 507 S.W.2d at 524.  The limits to the Legislature=s authority are
that the classification must be (1) broad enough to include a substantial
class, and (2) based on characteristics legitimately distinguishing the class
from others with respect to the public purpose sought to be accomplished by the
proposed legislation.  Sheldon, 22
S.W.3d at 450; Maple Run, 931 S.W.2d at 945.   








However, the Aprimary and
ultimate@ test of whether a
law is general or special is whether there is a reasonable basis for the
classification made by the law, and whether the law operates equally on all
within the class.  Sheldon, 22
S.W.3d at 451; Maple Run, 931 S.W.2d at 945.  Before a statute can be struck down as
violating Article III, section 56, Ait must clearly
appear that there is no reasonable basis for the classification adopted by the
Legislature@ to support the statute.  Cameron County, 326 S.W.2d at
167.  This lack of reasonable basis Ashould be a
substantial thing and not something merely apparent but not real.@  Id.

B.      Robinson=s Arguments.

Mrs. Robinson contends that the Statute was enacted to benefit Crown
Cork alone, and, therefore, the Legislature=s classification does not include a substantial class and
is not based on characteristics legitimately distinguishing the class from
others.  See Sheldon, 22 S.W.3d at
450; Maple Run, 931 S.W.2d at 945. 
Mrs. Robinson argues that (1) the Statute is tailored to fit Crown Cork
exclusively and Crown Cork is the only company known to have taken advantage of
it, (2) the Statute=s narrowly defined class bears no
reasonable relation to its stated purposes, and (3) a senator=s comments in committee reveal the
Statute to be nothing more than a prohibited Apretend@ class based on an agreement to
advance Crown Cork=s personal interests.  We address each argument in turn.  

 

1.       Robinson
Has Not Shown that the Statute Benefits Crown Cork Exclusively.

These are Mrs. Robinson=s specific reasons
for maintaining that the Statute is tailored to fit only Crown Cork:

!                  
The
Statute was modeled after similar statutes enacted to benefit Crown Cork in
Pennsylvania and Mississippi;[11]








!                  
Neither
Crown Cork nor Mrs. Robinson can identify another company that has taken
advantage of the Statute or the Pennsylvania and Mississippi statutes;

!                  
The
narrowing details of the Statute precisely fit Crown Cork=s purchase, manufacturing, and
merger history, thereby enabling only Crown Cork to fit within the Statute=s limitation of liability;

!                  
Crown
Cork=s valuation expert could not identify
another corporation meeting the requirements; and

!                  
Crown Cork=s valuation expert
used the same valuation prepared for the Pennsylvania litigation.

As we have noted, each of these specific
complaints raises an issue universal to all of them: that the Statute was
enacted to benefit only Crown Cork.  For
the reasons explained below, we disagree that these facts transform the Statute
into a special law.

First, even though this is a summary
judgment requiring that we view all facts in a light most favorable to Mrs.
Robinson, we still must indulge A>a strong
presumption that a Legislature understands and correctly appreciates the needs
of its own people, that its laws are directed to problems made manifest by
experience, and that its discriminations are based upon adequate grounds.=@  City of Irving v. Dallas/Fort Worth Int=l Airport Bd., 894 S.W.2d 456,
466 (Tex. App.CFort Worth 1995, writ denied) (citing Smith
v. Davis, 426 S.W.2d 827, 831 (Tex. 1968)). 
In addition, the primary test is not whether the Statute does, in fact,
apply to only one entity.  The primary
test, in actuality a twoBpart test, is (a) whether a reasonable
basis exists for the classification, and (b) whether the law operates equally
on all within the class.  Sheldon,
22 S.W.3d at 451.  Factual inquiries have
a similarly taxing presumption:

[Generally,] the
constitutionality of a law is not to be determined on a question of fact to be
ascertained by the court.  If under any
possible state of facts an act would be constitutional, the courts are bound to
presume such facts exist; and therefore the courts will not make a separate
investigation of the facts, or attempt to decide whether the legislature has
reached a correct conclusion with respect to them.

Garcia, 893 S.W.2d at 520 (citing Corsicana
Cotton Mills v. Sheppard, 123 Tex. 352, 71 S.W.2d 247, 250 (Tex. Comm=n App. 1934)).








Thus, with these guidelines in mind we
turn to the specific complaints.  As
noted, if the allegation were true that only Crown Cork fits within the Statute=s restrictive
details, that is not, in and of itself, proof that the Statute is a special
law.  Moreover, the fact that only Crown
Cork has taken advantage of the law is not necessarily proof that it applies
only to Crown Cork.

Even assuming that only Crown Cork can
benefit from the Statute, the primary test is whether a reasonable basis exists
for the classification and whether it operates equally on all within its
class.  Mrs. Robinson has not alleged
that the statute does not operate equally on all those in its class, so the
only question before us is whether a reasonable basis for the classification
exists.

The policy goals underlying the Statute
are expressly set out in the Statute=s Statement of
Legislative Intent, detailed above.  The
statement reflects that the rationale and purpose of the legislation was (1) Ato limit the
benefits of the statute to those who were more innocent than others and were
unwittingly saddled with often massive long-tail liabilities only because of a
merger,@ and (2) Ato help keep
remaining hard-pressed successors out of bankruptcy.@  H.J.
of Tex., 78th Leg., R.S. 6044 (2003). 

The Statement of Legislative Intent also
explained the unique merger, succession and year requirements contained in the
Statute.  Representative Nixon, the
author of House Bill 4, explained that successor corporations would have been
much less likely to be aware of the hazards of asbestos prior to May 13, 1968,
because

It wasn=t until the mid-1960s that Dr.
Irving Selikoff issued his now famous warnings about the dangers of asbestos in
the workplace.  The earliest date after
Selikoff=s warnings when even a
quasi-governmental organization in the United States suggested a tighter
standard for asbestos in the workplace was, however, May 13, 1968.  On that date, the influential American Conference
of Governmental Industrial Hygienists (ACGIH) first adopted a change in the
recommended, longstanding threshold limit for asbestos in the air of a
workplace from 5 mppcf to 2 mppcf (the ACGIH 1958 Standard).








. . . By requiring that the first transfer of asbestos
liabilities to a successor occurred prior to May 13, 1968, the legislation
therefore focuses its benefits upon innocent successors. 

H.J. of Tex., 78th Leg., R.S.
6044 (2003).  

Although Mrs. Robinson disputes the dates
contained in the Statement of Legislative Intent and claims that the Texas
Department of Health suspected at least some of the harmful impact of asbestos,
a mere difference of opinion, where reasonable minds could differCas between 1968
and 1958Cis not a
sufficient basis for striking down legislation. 
See Garcia, 893 S.W.2d at 520 (citing Davis, 426 S.W.2d at
831).

As we noted in the previous section, when
we compare the purposes of the legislation with its requirements, we find the
requirements tailored to serve the Statute=s purposes.  By enacting the Statute, the Legislature
impacted many lawsuits against Crown Cork in various courts across the State,[12]
and did much to ensure financial stability to the company=s current
workforce and pensioners.  The viability
of corporations and their ability to continue to provide jobs and pension
benefits are matters of importance to Texas and its citizens.  

The Legislature sought to ameliorate the
effects of asbestos-related liabilities by limiting the amount of money
innocent successor corporations are liable for in damages to the total gross
asset value of the original corporation. 
Moreover, the Legislature sought to narrow the class to include only the
most innocent of successor corporations, excluding those that continued in the
asbestos business.  We cannot say that
there is no reasonable basis for this classification.  We therefore hold that a reasonable basis
exists for the Statute=s classification of innocent successor
corporations, like Crown Cork, burdened by asbestos liabilities.  See Sheldon, 22 S.W.3d at 451; Maple
Run, 931 S.W.2d at 945; Cameron County, 326 S.W.2d at 167; see
also City of Irving, 894 S.W.2d at 465B67 (upholding
classification applying to one airport as reasonable because it addressed a
matter of statewide importance).








2.       Robinson
Has Not Shown that the Statute=s Class Bears No
Reasonable Relation to Its Stated Purposes.

We next turn to Mrs. Robinson=s contention that
the Statute=s narrowly defined class bears no
reasonable relation to its stated purposes. 
According to Mrs. Robinson, Crown Cork is not on the verge of
bankruptcy, and so a class that includes only Crown Cork is not rationally
related to the objective of saving Ahard-pressed
successors@ from bankruptcy.  Mrs. Robinson=s argument ignores
the other stated purpose of the StatuteCto eliminate
unfairness to innocent successor corporationsCand the effect of
the Statute=s limitation of liability.  Following the 1966 merger with Mundet, Crown
Cork did not sell, distribute, or manufacture any asbestos products; yet, it
has paid over $413 million to settle asbestos-related claims as a result of the
merger.  This amount far exceeds the fair
market value of Mundet=s total gross assets, which Crown Cork has
calculated to be between $55.6 million and $57.5 million.  Moreover, the Statute does not include any
requirement that a successor corporation demonstrate that it faces impending
bankruptcy.  Instead, the Statute seeks
to ameliorate unfairness and the threat of bankruptcy by limiting the innocent
successor=s liability to the fair market value of
the total gross assets of the transferor corporation.  

Thus, Crown Cork=s inclusion in the
class is rationally related to the Statute=s stated purposes,
because it will cap the amount of money Crown Cork is liable to pay out for
asbestos-related liabilities resulting solely from its merger with Mundet.  Beyond this, we decline to second-guess the
Legislature Aor attempt to decide whether the
legislature has reached a correct conclusion with respect to@ the facts before
it.  See Garcia, 893 S.W.2d at 520.

3.       A
Senator=s Comment Does Not
Reveal a APretend Class.@








Finally, we address Mrs. Robinson=s contention that
a member of the Texas Senate State Affairs Committee made comments that unmask
the Statute as creating a prohibited Apretend class@ based on an
agreed arrangement to advance Crown Cork=s personal
interests rather than the public welfare.  
See Scurlock Permian Corp., 869 S.W.2d at 485 (AThe class created
by the statute must be a real class, and not a >pretended= class created by
the legislature to evade the constitutional restriction.@) (citations
omitted).  During a meeting of this
committee, its chair described Article 17 of House Bill 4 to the members of the
committee as follows:

Article 17, limitations in civil actions of liabilities
relating to certain mergers or consolidations. 
This, members, is the Crown Cork and Seal asbestos issue.  What we have put in this bill is what I
understand to be an agreed arrangement between all of the parties in this -- in
this matter.

Meeting on Proposed Senate Substitute for Tex. H.B. 4,
State Senate Affairs Committee, 79th Leg., R.S., 13 (April 30, 2003).  Although the Senator identified Crown Cork by
name to describe the issue addressed by Article 17, we do not agree that this
is proof positive that the Legislature has acted improperly to benefit Crown
Cork=s private
interests exclusively. 

In Juliff Gardens, the appellant
made a similar argument that the legislative history of a statute evidenced a
legislative effort to prevent it from building a particular landfill.  Juliff Gardens, L.L.C. v. Tex. Comm=n on Envtl.
Quality, 131 S.W.3d 271, 283 (Tex. App.CAustin 2004, no
pet.).  The court, after reviewing the
legislative history, rejected this argument, explaining that A[w]hen reviewing a
statute to determine whether it is an unconstitutional local or special law, we
review the reasonableness of the statute=s classifications,
. . . not the precipitating forces that led to its enactment.@ Id.  The court reasoned that merely because the
appellant=s proposed landfill and the subsequent
community opposition to it may have initiated the senator to sponsor the
proposed legislation, that did not render it a prohibited local or special
law.  Id. at 284.  

Similarly, the senator=s brief mention of
Crown Cork as a beneficiary of the StatuteCin a single
paragraph of a fifteen-page transcriptCdemonstrates at
most that Crown Cork=s situation may have provided the impetus
for its passage.  It does not, as Mrs.
Robinson suggests, demonstrate that the Legislature acted improperly to evade
constitutional requirements. 

In light of our foregoing discussion, we
overrule Mrs. Robinson=s second issue.








III.      Crown
Cork is Entitled to Summary Judgment.

In her third issue, Mrs. Robinson contends
that she raised a fact question about whether Crown Cork continued Mundet=s asbestos
business for several months after acquiring it. 
The existence of this fact question, Mrs. Robinson argues, prevents
Crown Cork from showing that it is entitled to the Statute=s limitation of
liability as a matter of law.  Summary
judgment for a defendant is proper only when the defendant negates at least one
element of each of the plaintiff's theories of recovery, or pleads and
conclusively establishes each element of an affirmative defense.  Science Spectrum, Inc. v. Martinez,
941 S.W.2d 910, 911 (Tex.1997).  In
considering this issue, we use the well-established standards of review for
traditional summary judgments.  See
Tex. R. Civ. P. 166a; Nixon v.
Mr. Prop. Mgmt. Co., Inc., 690 S.W.2d 546, 548B49 (Tex. 1985). 

The Statute=s limitation of
liability does not apply to Aa successor that,
after a merger or consolidation, continued in the business of . . .
manufacturing, distributing, removing, or installing asbestos-containing
products which were the same or substantially the same as those products
previously manufactured, distributed, removed, or installed by the transferor.@  Tex.
Civ. Prac. & Rem. Code '
149.002(b)(5).  Mrs. Robinson contends
that, after Crown Cork acquired a majority of stock in MundetCbut before the
1966 mergerCCrown Cork continued Mundet=s asbestos-related
business as a division of Crown Cork.  

Mrs. Robinson points to the following
evidence.  First, a now-deceased former
Mundet employee, who was in charge of Mundet=s Houston
operation at the time of the acquisition, testified in another case that all
the Mundet employees he knew went to work for Crown Cork, and that for about
three months Crown Cork continued to sell, contract for, and fill orders for
Mundet productsCincluding those containing asbestos.  Second, Mrs. Robinson points out that the
1964 bill of sale in which Mundet sold its insulation division to B-E-H
referred to Mundet as Aa Division of Crown Cork & Seal,@ and was signed by
Crown Cork=s chairman of the board on behalf of AMundet Cork
Corporation, a Division of Crown Cork & Seal Company, Inc.@  








Mrs. Robinson=s evidence,
however, does not raise a fact question on whether Crown Cork is entitled to
take advantage of the Statute=s limitation of
liability, because it predates the 1966 merger of Crown Cork and Mundet, and
the plain language of the Statute provides that it does not apply when the
transferee corporation continues the asbestos-related business of the
transferor company Aafter a merger or consolidation.@  See Tex.
Civ. Prac. & Rem. Code ' 149.002(b)(5)
(emphasis added).  Thus, evidence related
to Crown Cork=s and Mundet=s activities
before the merger is irrelevant to whether Mrs. Robinson=s claims
constitute Asuccessor asbestos-related liabilities@ that are limited
by the Statute.  Indeed, section
149.001(3) explicitly applies the limitation of liability to all claims Athat are related
in any way to asbestos claims based on the exercise of control or the ownership
of stock of the corporation before the merger or consolidation.@  Id. ' 149.001(3)
(emphasis added); see also ' 149.003.  

Therefore, because Mrs. Robinson=s evidence all
relates to events before the 1966 merger of Mundet and Crown Cork and because
selling products for only three months until a division is sold does not
qualify as Acontinuing the asbestos related business@ as contemplated
by the Statute, Mrs. Robinson did not raise a fact question as to whether Crown
Cork continued Mundet=s asbestos-related business after the
merger.  We conclude that Crown Cork has
demonstrated its entitlement to summary judgment based on the Statute=s limitation of
liability.

We overrule Mrs. Robinson=s third issue.

Conclusion








Although Mrs. Robinson and her husband
appear to have had valid causes of action against Crown Cork as a successor of
Mundet Corporation, the Legislature took action uniquely within its role as the
legislative branch of our government and enacted a statute it concluded was
reasonably necessary.  The purpose of the
Statute was to minimize the statewide negative financial effects of asbestos
litigation.  A consequence of the Statute
was to eliminate Mrs. Robinson=s ability to
recover against Crown Cork for her and her husband=s damages.  Because we hold that the Statute was a valid
exercise of the Legislature=s police power and
that the beneficial reasons for its enactment outweigh the negative impact on
Mrs. Robinson=s right to address the untimely death of
her husband, because we hold that the Statute benefitted the State as a whole
and is not a special law, and because Mrs. Robinson failed to create a fact
issue concerning the evidence Crown Cork presented to prove its affirmative
defense, we overrule Mrs. Robinson=s issues and
affirm the trial court=s judgment.

 

 

 

/s/      Wanda
McKee Fowler

Justice

 

Judgment rendered and Majority Opinion filed May 4,
2006 (Frost, J., dissenting).

Panel consists of Chief Justice Hedges and Justices
Fowler and Frost.











[1]  Mr. Robinson
succumbed to his illness during the litigation in the trial court, and Barbara
Robinson continued to pursue his claims under the wrongful death statute.





[2]  Mundet sold
its insulation division to Baldwin-Ehret-Hill (AB-E-H@) on February 8, 1964.





[3]  ASuccessor asbestos-related liabilities@ is defined in the Statute as: 

 

any liabilities, whether known or unknown, asserted or
unasserted, absolute or contingent, accrued or unaccrued, liquidated or
unliquidated, or due or to become due, that are related in any way to asbestos
claims that were assumed or incurred by a corporation as a result of or in
connection with a merger or consolidation, or the plan of merger or
consolidation related to the merger or consolidation, with or into another
corporation or that are related in any way to asbestos claims based on the
exercise of control or the ownership of stock of the corporation before the
merger or consolidation.  The term
includes liabilities that, after the time of the merger or consolidation for
which the fair market value of total gross assets is determined under Section
149.004, were or are paid or otherwise discharged, or committed to be paid or
otherwise discharged, by or on behalf of the corporation, or by a successor of
the corporation, or by or on behalf of a transferor, in connection with
settlements, judgments, or other discharges in this state or another
jurisdiction.

 

Tex. Civ. Prac. & Rem.
Code '
149.001(3).





[4]  An Aasbestos claim@ is
defined in the Statute as: 

 

any claim, wherever or whenever made, for damages,
losses, indemnification, contribution, or other relief arising out of, based
on, or in any way related to asbestos, including: 

(A) property damage caused by the installation,
presence, or removal of asbestos;

(B) the health effects of exposure to asbestos,
including any claim for:

(i) personal injury or death;

(ii) mental or emotional injury;

(iii) risk of disease or other injury;  or

(iv) the costs of medical monitoring or
surveillance;  and

(C) any claim made by or on behalf of any person
exposed to asbestos, or a representative, spouse, parent, child, or other
relative of the person.

 

Tex. Civ. Prac. & Rem. Code
' 149.001(1).





[5]  The Statute
provides that a corporation may establish the fair market value of total gross
assets by any method reasonable under the circumstances, including (1) by
reference to the going concern value of the assets or to the purchase price
attributable to or paid for the assets in an arm=s‑length
transaction; or (2) in the absence of other readily available information from
which fair market value can be determined, by reference to the value of the
assets recorded on a balance sheet.  Tex. Civ. Prac. & Rem. Code ' 149.004(a). 
The fair market value of total gross assets may not reflect a deduction
for any liabilities arising from any asbestos claim.  See id. '
149.004(d).  The fair market value at the
time of the merger or consolidation is then adjusted as provided for
inflation.  See id. ' 149.005.





[6]  Sections
149.001(2) and 149.002(a) limit the Statute=s
application to a domestic corporation or a foreign corporation Athat has had a certificate of authority to transact
business in this state or has done business in this state.@  It is
undisputed that Crown Cork meets this criteria.





[7]  Mrs. Robinson=s challenge to the retroactive
application of the Statute is an Aas applied@ challenge, meaning that a generally constitutional statute
operates unconstitutionally as to her because of her particular
circumstances.  See Tex. Workers= Comp. Comm=n v. Garcia, 893 S.W.2d 504, 518 n.16 (Tex.
1995).





[8]   Courts have not tested retroactive legislation
only by employing a vested rights analysis. 
Some Texas courts and courts of other states have employed additional
terminology to help them assess if a right is alterable.  Some of these courts have referred to some
alleged rights merely as Aremedies@ to illustrate what can be altered
(remedy) and what cannot be altered (vested right).  See Ex Parte Abell, 613 S.W.2d at 259B61; Wright, 464 S.W.2d at
648B49; In re Goldman, 868 A.2d
278, 281B82 (N.H. 2005); In re Estate of
DeWitt, 54 P.3d 849, 854 & n.3 (Colo. 2002) (en banc); State v.
MacKenzie, 60 P.3d 607, 614 (Wash. Ct. App. 2002); In re Good Samaritan
Hosp., 668 N.E.2d 974, 977 (Ohio Ct. App. 1995); Olsen v. Special Sch.
Dist. #1, 427 N.W.2d 707, 711B12 (Minn. Ct. App. 1988); Smith, 5 Tex. L. Rev. at 241 (ARights, it has frequently been said, may not be
retrospectively denied, but no man can have a vested right to a particular
remedy.@) (footnote omitted).  To further confuse matters, other courts have
held that even a remedy cannot be taken away entirely by a retroactive
statute.  See City of Tyler v. Likes,
962 S.W.2d 489, 502 (Tex. 1997) (citing De Cordova v. City of Galveston,
4 Tex. 470, 480 (1849)).  Each of these
methods has been applied inconsistently. 
See Smith, 5 Tex. L. Rev.
at 240B48.  Other courts have analyzed
allegedly vested rights using other factors altogether.  See Plotkin v. Sajahtera, Inc.,
131 Cal. Rptr. 2d 303, 310B11 (Cal. Ct. App. 2003) (weighing the significance of
the state interest served by the law and the importance of the retroactive
application of law to achieve the law=s
purposes, the extent of reliance on the former law, the legitimacy of that
reliance, the extent of actions taken on the basis of that reliance, and the
extent to which retroactive application would disrupt those actions); see also
Norbrega, 772 A. 2d at 379B83.  





[9]  Asbestos litigation has also
strained the resources of our courts. 
The United States Supreme Court has described the ever-increasing number
of asbestos cases in our state courts as an Aelephantine mass@ that Adefies customary judicial administration and calls for
national legislation.@ 
See Ortiz v. Fibreboard Corp., 527 U.S. 815, 821 (1999); see
also Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 598 (1997) (A>The most objectionable aspects of
asbestos litigation can be briefly summarized: dockets in both federal and
state courts continue to grow; long delays are routine; trials are too long;
the same issues are litigated over and over; transaction costs exceed the
victims= recovery by nearly two to one;
exhaustion of assets threatens and distorts the process; and future claimants
may lose altogether.=@) (quoting Report of The Judicial
Conference Ad Hoc Committee on Asbestos Litigation 2B3 (Mar.1991)).  The Texas Legislature recently enacted
additional asbestos-related legislation in an effort to address some of the
problems faced by litigants in our courts. 
See Act of May 11, 2005, 79th Leg., R.S., ch. 97, 2005 Tex. Gen.
Laws 169 & ' 1(e) (AAn Act Relating to Civil Claims
Involving Exposure to Asbestos and Silica@) (to be codified at Tex.
Civ. Prac. & Rem. Code '' 90.00C90.0012) (ATexas has not been spared this crisis.  In the period from 1988 to 2000, more
lawsuits alleging asbestos-related disease were filed in Texas than in any
other state.  Thousands of asbestos
lawsuits are pending in Texas courts today.@).






[10]  Federal courts
also address many claims of allegedly unconstitutional retroactive
statutes.  In fact, until the 1930s, the
United States Supreme Court routinely and consistently struck down retroactive
statutes.  See Jill E. Fisch, Retroactivity
and Legal Change: An Equilibrium Approach, 110 Harv. L. Rev. 1055, 1063B64
(1997); Daniel E.Troy, Toward a Definition and Critique of Retroactivity,
51 Ala. L. Rev. 1329, 1350B51 (2000).  Not
until the New Deal did the Court begin to affirm the constitutionality of
retroactive statutes.  Fisch, 110 Harv. L. Rev. at 1063B64; Troy, 51 Ala.
L. Rev. at 1351; see also, Landgraf v. USI Film Prods., 511 U.S.
244, 265B69 (1994) (noting that the Supreme Court has given
greater deference in the 1900s to legislative judgments that a statute must be
applied retroactively).  Since that time,
the Court has been more accepting of retroactive laws.  Fisch, 110 Harv.
L. Rev. at 1064; Troy, 51 Ala. L.
Rev. at 1351.  Recently, however,
some justices have begun to review retroactive laws in a more negative light.  See U.S. v. Carlton, 512 U.S. 26, 39B41 (1994) (Scalia, J., joined by Thomas, J.,
concurring). 





[11]  See 15 Pa. C.S. ' 1929.1
(2004); Miss. Code Ann. '' 79-31-1B79-31-11
(2004). 





[12]  Crown Cork
represents that there are currently more than 20,000 cases in Texas alone in
which Crown Cork is being sued for asbestos-related liabilities because it is a
successor through merger or consolidation. 
Mrs. Robinson does not dispute this claim.